1

Honorable Marsha J. Pechman

2

3

4

5

6

7

8

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON AT SEATTLE

9

| | |
|---|---|
| RICHARD L. POPE, JR., individually and on behalf of all others similarly situated, | NO. 2:15-cv-02015-MJ |
| Plaintiff, | |
| v. | |
| TROY X. KELLEY, DIANE D. KELLEY, and the marital community comprised thereof, UNITED NATIONAL, LLC, and BLACKSTONE INTERNATIONAL, INC., | FIRST AMENDED COMPLAINT FOR DAMAGES |
| Defendants. | **CLASS ACTION** |

10

11

12

13

14

15

16

17

### Parties

18        1.        Plaintiff RICHARD L. POPE, JR. is a resident of King County, Washington.

19        2.        Defendants TROY X. KELLEY and DIANE D. KELLEY are individuals residing

20   in Pierce County, Washington.  They are married to each other and have a martial community

21   under Washington law.  All actions of either Defendant KELLEY were done for the benefit of

22   their marital community and their marital community are liable for such action,

23        3.        Defendant UNITED NATIONAL, LLC is a Washington limited liability company

24   and is an alter ego for Defendants KELLEY under their dominion and control.

25        4.        Defendant BLACKSTONE INTERNATIONAL, INC. is a Nevada corporation

26   doing business in the State of Washington and is an alter ego for Defendants KELLEY under the

27   dominion and control.

28

**FIRST AMENDED COMPLAINT FOR DAMAGES -- 1**

**Lake Hills Legal Services P.C.**
**15600 N.E. 8th Street, # B1-358**
**Bellevue, Washington  98008**
**Telephone:  (425) 829-5305**
**E-mail:  rp98007@gmail.com**

1

**Jurisdiction and Venue**

2    5.    The United States District Court for the Western District of Washington lacks

3   subject matter jurisdiction over this action.  Defendants removed this action to federal court on

4   December 28, 2015 based upon federal question jurisdiction under 28 U.S.C. § 1331, as

5   Plaintiff's original complaint had pleaded a cause of action under the Racketeer Influenced and

6   Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-62 & 1964.

7    6.    Since Plaintiff has amended the Complaint to eliminate the federal RICO claim,

8   this Court no longer has subject matter jurisdiction and this case should be remanded to the King

9   County Superior Court, where it was originally filed and from where it was removed.

10    7.    The King County Superior Court has proper venue and jurisdiction as the Plaintiff

11   resides in and at least one of the Defendants did business in King County, Washington and the

12   actions complained of herein, or some of them occurred in whole or in part in King County.

13

**Basis of Claim**

14    8.    Plaintiff incorporates all the allegations contained in the Superseding Indictment

15   entered on September 3, 2015 in <u>United States of America v. Troy X. Kelley</u>, United States

16   District Court for the Western District of Washington at Tacoma, No. CR15-5198RBL by

17   reference herein.  This document is attached as Exhibit 1 and consists of 160 paragraphs.  Each

18   of the incorporated paragraphs should be admitted, denied or otherwise addressed in any answer.

19    9.    Plaintiff believes Defendants started the fraudulent scheme outlined in the

20   Superseding Indictment earlier than January 1, 2006 and in fact at the same time or shortly after

21   Defendants entered into the contract with Fidelity National Title Company of Washington, Inc.

22   in October 2003 referenced in Paragraphs 15 and 16 of the Superseding Indictment.

23    10    Plaintiff believes Defendants failed to return the escrow amount in the

24   overwhelming majority of closing transactions (likely over 99%) and that there were no

25   recording, reconveyance or other charges paid out of the escrow amount in the overwhelming

26   majority of closing transactions (likely over 99%).  This affected an estimated 30,000 to 50,000

27   homeowners who never received refunds on moneys held in trust by Troy Kelley et al.

28

**FIRST AMENDED COMPLAINT FOR DAMAGES -- 2**

11.     Plaintiff refinanced his home at 1839 – 151st Avenue, S.E., Bellevue, Washington 98007 (settled on August 31, 2005), to satisfy his former wife's interest in the property, pursuant to a dissolution settlement.  The escrow closing was handled by the Bellevue office of Fidelity National Title Company of Washington, Inc.  There was an existing deed of trust mortgage on the property owed to Chase Bank, which had originally been taken by his former wife.  Plaintiff was responsible to pay off this prior mortgage in full, and also make a substantial payment to his former wife for her interest in the property. Plaintiff took out a new deed of trust mortgage loan from Greenpoint Funding, in order to fulfill his obligations under the decree of dissolution. Plaintiff had to pay his former wife a certain sum of money and pay all closing costs.

12.     When Plaintiff signed the closing documents, a day or two before the settlement date, the Fidelity Title escrow closer told him that he would have to pay $120.00 for reconveyance services for the prior deed of trust to Chase Bank that was being paid off.  The escrow closer told him this money was for the fees charged for recording the reconveyance documents with the King County recorder's office, and also for the services of the reconveyance trustee.  The line item on his closing statement appeared as $120.00 for "reconveyance/tracking fee" payable to "Post Closing Dept."  Plaintiff assumed this meant the "post closing department" of Fidelity Title, and this certainly didn't sound like a business separate from Fidelity. The escrow closer never told Plaintiff this money was really going to a separate company.

13.     In reality, "Post Closing Dept." was a trade name for "United National LLC", an alter ego LLC that Troy Kelley had set up to run a purported "reconveyance tracking" business. Trpy Kelley contracted with various escrow companies (apparently mostly being Chicago Title, Wells Fargo Escrow, Old Republic Title, and Fidelity Title) to track prior home mortgage deeds of trust that were being paid off in home sales or refinancing escrow situations. Based on what the Old Republic contract with Kelley stated, the escrow companies paid over to Troy Kelley somewhere between $120 to $150 for each deed of trust that was being tracked. In all cases, Troy Kelley was entitled to retain a fixed fee ($15 in case of the Fidelity contract, and $20 in the case of the Old Republic contract) for his services. If the lender did not timely file a

**FIRST AMENDED COMPLAINT FOR DAMAGES -- 3**

**Lake Hills Legal Services P.C.**
**15600 N.E. 8th Street, # B1-358**
**Bellevue, Washington  98008**
**Telephone:  (425) 829-5305**
**E-mail:  rp98007@gmail.com**

1  reconveyance, Troy Kelley was responsible for paying for the services of a reconveyance trustee

2  and the necessary county auditor recording fees.  Any moneys not used by Troy Kelley (above

3  the $15 or $20 tracking fee and out of pocket recording and trustee fees) were supposed to be

4  refunded directly to the escrow customer whose deed of trust was being paid off.  These extra

5  monies (above the $15 or $20 contract fee) were to be held in trust by Troy Kelley, and either

6  paid for actual out-of-pocket expenses or refunded to the mortgage holder in question.

7       14.    For Plaintiff's part, the prior mortgage lender Chase Bank immediately recorded

8  the reconveyance documents with the King County recorder's office on September 15, 2005. The

9  a payoff statement from Chase Bank, which included the $32.00 reconveyance recording fee as

10  part of the payoff amount that was handled through escrow. Plaintiff had already paid the lender

11  for these services and the lender promptly recorded the reconveyance document.

12       15.    So in Plaintiff's case, Troy Kelley should have only retained the reconveyance

13  tracking fee of $15.00 and returned the $105.00 remainder of the total $120.00 fee.  Troy Kelley

14  certainly did not have to pay for any county recording fees or reconveyance trustee fees, since

15  the lender Chase Bank promptly recorded these documents. However, Plaintiff never received

16  any refund whatsoever from Troy Kelley or the other Defendants or anyone else.

17       16.    While Plaintiff did have some general knowledge of the real estate financing and

18  escrow closing process (although no prior experience dealing with any such transaction

19  involving his own real property), Plaintiff's reasonable subjective belief during and after the

20  2005 transaction was that everything had been done correctly.  None of the numerous written

21  disclosures said anything about the "Post Closing Department" payment, other than the line item

22  with the trade name, $120.00 amount, and the "reconveyance/tracking fee".  Nothing about the

23  nature, identity, address or other contact information for the "Post Closing Department" was

24  disclosed.  No further details of the purpose of this payment, the fact that only $15.00 was for

25  actual tracking services, or that the balance was to be refunded if not used was disclosed.  There

26  was never any follow-up communication by Fidelity or the "Post Closing Department", to

27  include no refund of unused monies, accounting for unused monies, or for any other purpose.

28  **FIRST AMENDED COMPLAINT FOR DAMAGES -- 4**

Lake Hills Legal Services P.C.
15600 N.E. 8th Street, # B1-358
Bellevue, Washington  98008
Telephone:  (425) 829-5305
E-mail:  rp98007@gmail.com

1

**Class Action Allegations**

2    17.    Plaintiff brings this action individually on his own behalf and as a representative of

3    a class pursuant to Rule 23 of the Civil Rules of Superior Court.  This action is maintainable as a

4    class action under CR 23(b)(1), CR 23(b)(2) and CR 23(b)(3).  This action could also be

5    maintained as class action under Rule 23 F.R.Civ.P., but the federal court lacks subject matter

6    jurisdiction due to the amendment of the complaint to exclude the sole federal cause of action.

7    18.    The class consists of all persons who closed any real estate transaction in the State

8    of Washington through Chicago Title, Wells Fargo Escrow, Old Republic Title, Fidelity Title, or

9    a similar company during the period August 1, 2002 to August 31, 2008 and paid a reconveyance

10   tracking fee to any of the Defendants herein connected to a paid off deed of trust or mortgage,

11   and did not receive a refund of the (supposedly) escrowed portion of the reconveyance tracking

12   fee amount within 30 days after the reconveyance document was recorded.

13   19.    Some portion of the class members, especially those customers of Old Republic

14   Title, may have receive a portion of the escrowed amount refunded to them (especially through a

15   lawsuit Defendants settled that was filed against them by Old Republic Title).  In that case, these

16   class members would still be still be entitled to have the remaining escrowed funds returned to

17   them, receive statutory 12% interest on all monies due, and trebled or other increased damages.

18   20.    The class is so numerous as to make it impracticable to bring all class members

19   before the court.  At this time, Plaintiff does not know the exact number of class members but

20   believes the class has more than 35,000 members.  Plaintiff believes the total amount of principal

21   that was defrauded from class members by Defendants to be in excess of $3.8 million.

22   21.    Plaintiff learned of some of Defendants' wrongful actions for the first time by

23   reading a blog on SoundPolitics.Com on September 6, 2012.  Plaintiff learned of the remainder

24   of Defendants' wrongful actions – including the numerous fraudulent transfers of money to

25   Blackstone and to the Kelleys personally on or about April 15, 2015 and September 5, 2015,

26   after reading news media accounts of Troy Kelley's indictment (referenced herein) and also

27   looking at the federal court original indictment and superseding indictments for those details.

28

**FIRST AMENDED COMPLAINT FOR DAMAGES -- 5**

22.     The vast majority of class members have never learned that Defendants' fraudulent actions affected them at any point in time and no statute of limitations defense would be viable.

23.     Plaintiff filed this action in King County Superior Court on September 8, 2015. This date would satisfy any statute of limitations for three years or longer under the "discovery rule" based upon the information Plaintiff discovered on September 6, 2012.  September 6, 2015 was a Sunday and Monday, September 7, 2015 was the Labor Day state holiday under RCW 1.16.050.  Under RCW 1.12.040 and Wash. CR 6(a), deadlines cannot expire on a Saturday, Sunday or legal holiday, and instead ended on the next business day that is not a Saturday, Sunday or legal holiday – namely the lawsuit filing date of Tuesday, September

24.     Troy Kelley closed the business operations of United National sometime in the summer of 2008, shortly after several class action lawsuits were filed in the Seattle federal court against Old Republic, Fidelity and others (but not against Kelley or his companies), in relation to the improperly retained portions of the "reconveyance tracking fees".

25.     Prior to closing United National, Kelley had transferred perhaps several hundred thousand dollars from United National account to his personal accounts or other entities that he controlled.  These transfers were done illegally, without lawful consideration and without substantially equivalent consideration, evidently were not reported on the income tax and other business returns (such as state business and occupation tax returns) of Kelley and other receiving entities, and were done with the intent to defraud the homeowners who should have received refunds from United National "Post Closing Department" of the unused portions of the "reconveyance tracking fees", and to leave United National without sufficient funds to pay its creditors (including, but not limited to, the homeowners entitled to receive refunds).

26.     At the time United National was closed in the summer of 2008, there was still as much as $3.5 million remaining in its bank accounts.  The vast majority (perhaps even more than was on deposit, due to the prior withdrawals) was owed to its creditors, including 30,000 to 50,000 homeowners who were entitled to refunds and even some to Old Republic and Fidelity for reconveyance tracking services not yet completed when the business suddenly closed.

**FIRST AMENDED COMPLAINT FOR DAMAGES -- 6**

27.     Kelley caused all of these monies to be transferred out of United National's accounts into his own personal accounts and into the accounts of various business entities, including Blackstone, that he owned or controlled.  These transfers were done illegally, without lawful consideration and without substantially equivalent consideration, in numerous cases were not reported at all or not properly reported on the income tax and other business returns (such as state business and occupation tax returns) of Kelley and other receiving entities, and were done with the intent to defraud the homeowners who should have received refunds from United National "Post Closing Department" of the unused portions of the "reconveyance tracking fees", and to leave United National and/or the other business entities without sufficient funds to pay its creditors (including, but not limited to, the homeowners entitled to receive refunds).

28.     These transfers continued for many years after 2008.  They included annual transfers to Kelley and/or Blackstone for at least $245,000 annually for each of the years between 2010 and 2015 inclusive, for fraudulently realizing income for non-existent services performed against the unused monies that should have been refunded to the homeowners.  In addition, up to several hundred thousand dollars of business expenses were claimed as tax deductions against these same unused monies that should have been refunded.  Many of these alleged tax deductions would have been improper under the Internal Revenue Code in any event, and all of them were fraudulent with respect to the class members, as these unused monies should have been refunded to the homeowners.  Again, these transfers were done illegally, without lawful or substantially equivalent consideration, with the intent to defraud the class members, and to leave insufficient money available to pay class members and other creditors.

29.     From the remaining funds, representing unused monies which should have been returned to homeowners, on or about March 26, 2015, Kelley wrote a check to the United States Treasury or Internal Revenue Service for $447,421 (with a notation this was for future taxes owed for 2016 to 2020, and a check for $908,397 to a trust account held with the Davis, Wright, Tremaine law firm.  The latter funds are now being held by attorney Angelo J Calfo, or the Calfo Harrigan Leyh & Eakes LLP law firm, in a trust account, blocked account or some other account.

**FIRST AMENDED COMPLAINT FOR DAMAGES -- 7**

1    Both of these transactions were intended for Kelley's personal benefit, and were not done for any

2    legal or legitimate reason for the class members.  Again, these transfers were done illegally,

3    without lawful or substantially equivalent consideration, with the intent to defraud the class

4    members, and to leave insufficient money available to pay class members and other creditors.

5          30.    While the entire September 3, 2015 superseding indictment is incorporated herein,

6    there are additional details of the fraudulent transfers involving Kelley, business entities under

7    his control, and other persons or entities contained in the superseding indictment.

8          31.    All of this constitutes a continuing course of conduct from the summer of 2008

9    through at least March 26, 2015, if not latter, to defraud the class members and convert monies

10   which United National a/k/a/ "Post Closing Department" was required to refund to the class

11   members, if not actually spent in making sure the deed of trust conveyances were executed and

12   recorded.  This is a continuing pattern of fraudulent transactions, totally unrelated to any need to

13   properly execute and record reconveyances, designed to deplete monies held in trust for the class

14   members and instead fraudulently convert these monies to Kelley's use or benefit.  The final

15   diversion of at least $1.35 million on March 26, 2015 was intended to pay Kelley's future

16   income tax liabilities and the cost of legal defense (including the federal court criminal charges

17   in the superseding indictment), which is a totally illegitimate use of the class members' money.

18         32.    There are questions of law or fact common to the claims of all members of the

19   class.  These questions include, but are not limited to, the following:

20         (a)    Were there monies that Defendants obtained in reconveyance tracking fees,

21   in excess of the $15 to $20 basic fee for such services, that were supposed to have been held in

22   escrow and refunded to the escrow customers if not used for trustee or reconveyance fees?

23         (b)    Did Defendants breach their contracts with the escrow companies and with

24   the escrow customers by failing to promptly refund the unearned escrow fees?

25         (c)    Did Defendants commit conversion against the escrow companies and with

26   the escrow customers by failing to promptly refund the unearned escrow fees and then taking

27   hese monies from the escrow account and converting them to their own use?

28
**FIRST AMENDED COMPLAINT FOR DAMAGES -- 8**

1          (d)     Are Defendants' actions in failing to promptly refund the unearned escrow

2 fees and then taking these monies from the escrow account and converting them to their own use

3 unfair or deceptive acts or practices in trade or commerce under the Consumer Protection Act?

4          (e)     In committing the actions alleged in this Complaint and in the Superseding

5 Indictment, did Defendants commit the crimes of theft, money laundering, wire fraud, the other

6 offenses alleged in the Superseding Indictment and other crimes under state and federal law?

7          (f)     Do the actions of Defendants alleged in this Complaint and in the

8 Superseding Indictment constitute Criminal Profiteering as defined in Chapter 9A.82 RCW?

9          (g)     Do the actions of Defendants alleged in this Complaint and in the

10 Superseding Indictment constitute defalcation and breach of fiduciary duty?

11    33.    Plaintiff's claims are typical of the claims of the members of the class.    The

12 claims of all class members arise from the same general set of facts and questions of law.

13    34.    Plaintiff will fairly and adequately protect the interests of the class.

14    35.    The prosecution of separate actions by individual members of the class would

15 create a risk of (a) inconsistent or varying adjudications with respect to individual members of

16 the class which would establish incompatible standards of conduct for the defendants or (b)

17 adjudications with respect to individual class members which would as a practical matter be

18 dispositive of the interests of the other members not parties to the adjudications or substantially

19 impair their ability to protect their interests.

20    36.    The defendants have acted or refused to act on grounds generally applicable to the

21 class.  Final injunctive relief and/or corresponding declaratory relief against the defendants is

22 appropriate with respect to the class as a whole.

23    37.    Questions of law or fact common to the members of the class predominate over

24 any questions affecting only individual members, and that a class action is superior to other

25 available methods for the fair and efficient adjudication of the controversy.

26    38.    Plaintiff is unaware of any other pending litigation concerning the controversy at

27 issue, and no litigation which has been filed by any class member against the Defendants.  A

28

**FIRST AMENDED COMPLAINT FOR DAMAGES -- 9**

**Lake Hills Legal Services P.C.**
**15600 N.E. 8th Street, # B1-358**
**Bellevue, Washington  98008**
**Telephone:  (425) 829-5305**
**E-mail:  rp98007@gmail.com**

1    handful of class members previously sued some of the escrow companies, but not the

2    Defendants. Old Republic Title of Washington previously sued the Defendants on its own behalf

3    and received a partial settlement which may have allowed partial refunds to some class members.

4    It is believed that approximately $1 million of the $3.5 million in unused funds belonging to

5    class members was used for the Old Republic settlement. In turn, some of this money was used

6    by Old Republic for its legal costs in procuring and administering this settlement. This settlement

7    could reduce Defendants' liability to those class members for the net proceeds actually received.

8         39.    The Plaintiff class in this case is large but manageable. Identification of class

9    members can readily be made from the business records of the defendants and from the records

10   of the escrow companies with which Defendants contracted for reconveyance tracking services.

11   There are 30,000 to 50,000 class members, the largest portion believed to reside in King County.

12   **First Cause of Action – Breach of Contract**

13        40.    Defendants breached their contracts with the escrow companies, which also

14   imposed like contractual obligations on behalf of the escrow customers by failing to promptly

15   refund the unearned escrow fees after the reconveyance documents were recorded.

16        41.    Plaintiff and each class member is entitled to recover these unearned escrow fees,

17   together with 12% per annum statutory interest from the due date until these monies are paid.

18   **Second Cause of Action – Conversion**

19        42.    Defendants committed the tort of conversion by failing to promptly refund the

20   unearned escrow fees after the reconveyance documents were recorded and then taking these

21   monies from the escrow account and converting them to their own use. This tort involved

22   additional actions beyond a mere breach of contract, since Defendants did not simply keep the

23   unused money, but engaged in extraordinary fraudulent transactions to transfer and conceal the

24   money between Kelley, Blackstone, and other business entities, as well as numerous alleged

25   expenditures of the money for Kelley's personal benefit and to otherwise do away with it.

26        43.    Plaintiff and each class member is entitled to recover these unearned escrow fees,

27   and all funds which were converted from class member's trust ownership to Defendants'

28

**FIRST AMENDED COMPLAINT FOR DAMAGES -- 10**

1  personal use or other improper purposes, together with 12% per annum statutory interest from

2  the due date until these monies are paid.

3  ### Third Cause of Action – Washington Consumer Protection Act

4      44.    The actions of Defendants alleged in this Complaint and in the Superseding

5  Indictment, including but not limited to failing to promptly refund the unearned escrow fees after

6  the reconveyance documents were recorded and then taking these monies from the escrow

7  account and converting them to their own use, are unfair methods of competition and unfair or

8  deceptive acts or practices in the conduct of trade or commerce under RCW 19.86.020.

9      45.    Plaintiff and other class members have been injured in their business or property

10  by violations of the Consumer Protection Act by Defendants.  These actions have injured other

11  persons, or have had or do have the capacity to injure other persons. Defendants refused to

12  refund the unused monies to homeowners, unless the homeowner specifically request a refund.

13  As a result of this practice, and the fact that nearly all homeowners were ignorant of their right to

14  a refund of the unused monies, as many as 90% to 99% of all homeowners whose deeds of trust

15  were being "tracked" by Defendants should have received a refund, but never received anything.

16      46.    Under RCW 19.86.090, Plaintiff and other class members should collect their

17  actual damages, plus trebled damages of up to $25,000.00 above actual damages for each person

18  injured by Defendants' conduct, reasonable attorney fees, and all costs of this action.  This

19  would entitle Plaintiff and each class member to triple the actual amount of unearned escrow fees

20  (since none were over $12,500.00), plus 12% per annum interest from the due date until paid.

21  ### Fourth Cause of Action – Breach of Fiduciary Duty and Defalcation

22      47.    Defendants held anywhere between $105 to $135 from each transaction (the

23  amount in excess of the $15 to $20 earned reconveyance tracking fee) in trust for the benefit of

24  the homeowners whose deed of trust reconveyances were being "tracked".  By agreement with

25  and representation to Fidelity, Old Republic, and the other escrow companies, Defendants were

26  required to account for this money to the homeowners and pay over all unused portions of this

27  money to the homeowners.  Defendants owed homeowners the duty of a fiduciary.

28  **FIRST AMENDED COMPLAINT FOR DAMAGES -- 11**

48.     Defendants breached this fiduciary duty and committed defalcation against the homeowners by failing to account for these extra funds, and failing to pay over the unused portions of these funds to the homeowners, and by instead transferring this money from United National a/k/a "Post Closing Department" to Kelley, and various business entities under this control, including Blackstone.  Instead of either refunding these monies or actually using them to execute or record conveyances of deeds of trust, Defendants instead transferred these monies to Kelley, to Kelley's use or benefit, or for other purposes contrary to the trust undertaking.

49.     Plaintiff and each class member is entitled to recover these unearned escrow fees, and all funds which were defalcated or otherwise diverted in breach of fiduciary duty from class member's trust ownership to Defendants' personal use or other improper purposes, together with 12% per annum statutory interest from the due date until these monies are paid.

### Fifth Cause of Action – Criminal Profiteering Act

50.     The actions of Defendants alleged in this Complaint and in the Superseding Indictment, including but not limited to failing to promptly refund the unearned escrow fees after the reconveyance documents were recorded and then taking these monies from the escrow account and converting them to their own use, constitute a pattern of criminal profiteering activity as defined in RCW 9A.82.010, which have damaged Plaintiff and each class member by causing them to lose the unearned reconveyance tracking fees they were entitled to receive.

51.     The predicate felony criminal offenses for the Defendants' liability under the Criminal Profiteering Act pursuant to RCW 9A.82.010(4) include the following:

(a)     RCW 9A.56.030, First Degree Theft:  Defendants stole in excess of $5,000.00 from Plaintiff and other class members using a common scheme or plan, including intentionally failing to account for and pay over the unused funds (in excess of the earned $15 or $20 tracking fee) paid to Defendants.  While all of the individual amounts would only amount to Third Degree Theft, a gross misdemeanor under RCW 9A.56.050, the common scheme or plan allows these amounts to be aggregated under RCW 9A.56.010(21)(c) to make this into First Degree Theft. The total amount stolen from class members is about $3.5 million under this common scheme.

**FIRST AMENDED COMPLAINT FOR DAMAGES -- 12**

1       (b)    RCW 9A.82.050, Trafficking in Stolen Property in the First Degree:  The

2   approximately $3.5 million stolen from Defendants under the name of United National a/k/a

3   "Post Closing Department" was trafficked by being transferred, distributed, dispensed, or

4   otherwise disposed of to other persons, included Troy Kelley, Blackstone, other business entities

5   under Kelley's control, or otherwise used for Kelley's benefit and direction.

6       (c)    RCW 19.144.080, Mortgage Fraud:  Defendants' scheme of failing to account for

7   and pay over unused portions of homeowners' funds defrauded or materially mislead many

8   borrowers during the lending process.  Some of the class members were not borrowing money

9   during the escrow transaction, and would not be a victim under RCW 19.144.080.  However,

10  Plaintiff and a substantial portion of class members were refinancing their homes, with the

11  payoff of the existing deed of trust being an integral part of the lending process, and were also

12  victims of Mortgage Fraud under RCW 19.144.080, in addition to Defendants' other felonies.

13      52.    Under RCW 9A.82.100, Defendants are therefore liable to Plaintiff and each class

14  member for the actual amount of unearned escrow fees, plus 12% per annum interest from the

15  due date until paid, plus a civil penalty of up to $250,000.00, plus reasonable attorney fees, and

16  all costs of this action.

17      **Sixth Cause of Action – Fraudulent Transfer**

18      53.    The actions of Defendants alleged in this Complaint and in the Superseding

19  Indictment, including but not limited to failing to promptly refund the unearned escrow fees after

20  the reconveyance documents were recorded and then taking these monies from the escrow

21  account and converting them to their own use, as well as the numerous transfers of funds from

22  United National a/k/a "Post Closing Department", both before and after it was closed in the

23  summer of 2008, including all the transfers to and between Troy Kelley, Blackstone, and

24  Kelley's other business entities, and the other persons or entities from 2008 until at least March

25  2015, constituted a fraudulent transfer under Chapter 19.40 RCW.

26      54.    These transfers were done illegally, without lawful or substantially equivalent

27  consideration, with the intent to defraud the class members, and resulted in insufficient money

28

**FIRST AMENDED COMPLAINT FOR DAMAGES -- 13**

1   available to pay class members and other creditors, and violated RCW 19.40.041 and 19.40.051.

2   These fraudulent transfers continued until at least March 26, 2015.  Plaintiff learned of most of

3   them within the last year, on or about April 15, 2015 and again around September 5, 2015.

4       55.    Plaintiff and each class member are entitled to have this fraudulent transfer

5   avoided, and for Defendants to refund the unearned escrow fees and all monies which were

6   fraudulently transferred, together with 12% per annum interest.

7   **Prayer for Relief**

8       Wherefore Plaintiff prays for judgment against the Defendants as follows:

9       1.    Actual damages for Plaintiff and each class member in such sum as may be

10  determined, based upon the unearned (supposedly) escrowed portion of the each reconveyance

11  tracking fee that was supposed to be refunded when the reconveyance was recorded, together

12  with any other appropriate damages of breach of contract, conversion, breach of fiduciary duty,

13  and defalcation, and avoidance, restitution or other appropriate relief for the fraudulent transfers.

14      2.    Increased damages under RCW 19.86.090 for Plaintiff and each class member by

15  tripling actual damages that may be determined, up to $25,000.00 increase over actual damages.

16      3.    Civil penalty of up to $250,000.00 under RCW 9A.82.100 for Plaintiff and each

17  class member.

18      4.    Reasonable attorney fees pursuant to RCW 19.86.090, and RCW 9A.82.100

19      5.    All taxable costs of this action.

20      6.    Prejudgment and postjudgment interest at 12% per annum statutory interest.

21      7.    Remand this action to the King County Superior Court.

22      8.    All other general and equitable relief that may be just or appropriate.

23      Respectfully submitted this 25th day of January 2016.

24

25

26  _/s/ Richard L. Pope, Jr._
    RICHARD L. POPE, JR.

27  WSBA # 21118
    Attorney for Plaintiffs

28

**FIRST AMENDED COMPLAINT FOR DAMAGES -- 14**

**Lake Hills Legal Services P.C.**
**15600 N.E. 8th Street, # B1-358**
**Bellevue, Washington  98008**
**Telephone:  (425) 829-5305**
**E-mail:  rp98007@gmail.com**

1

2

3

4

Lake Hills Legal Services P.C.
15600 N.E. 8th Street, Suite B1-358
Bellevue, Washington  98008
Tel:  (425) 829-5305
Fax:  (425) 526-5714
E-Mail:  rp98007@gmail.com

5

## Proof of Service

6    I hereby declare under penalty of perjury under the laws of the United States of America

7    that, on January 25, 2016, I electronically filed the foregoing with the Clerk of the Court using

8    the CM/ECF system which will send notification of such filing to the following registered with

9    CM/ECF, including the Honorable Marsha J. Pechman, and all counsel of record for the other

10   parties to this case, including the following people listed on the system:

11   **Angelo J Calfo**  angeloc@calfoharrigan.com, florinef@calfoharrigan.com,
     susiec@calfoharrigan.com

12

13   **Richard Lamar Pope, Jr.**  rp98007@gmail.com

14    Signed at Bellevue, Washington this 25th day of January 2016.

15

16

17                                   /s/ Richard L. Pope, Jr.
                                     RICHARD L. POPE, JR.

18

19

20

21

22

23

24

25

26

27

28

**FIRST AMENDED COMPLAINT FOR DAMAGES -- 15**

# EXHIBIT 1

Judge Ronald B. Leighton

Presented to the Court by the foreman of the
Grand Jury in open Court, in the presence of
the Grand Jury and FILED in the U.S.
DISTRICT COURT at Seattle, Washington.

SEPTEMBER 3, 20 15

WILLIAM M. McCOOL, Clerk

By _____ Deputy

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA,

Plaintiff,

v.

TROY X. KELLEY,

Defendant.

No. CR15-5198RBL

**SUPERSEDING INDICTMENT**

THE GRAND JURY CHARGES THAT:

## INTRODUCTION

I.   **Background**

A.   ***The Defendant and Relevant Entities***

1.   TROY X. KELLEY, a resident of Tacoma, Washington, holds a J.D. and an M.B.A., and is an attorney licensed to practice law in the States of California, New York, and Washington, and in the District of Columbia. TROY X. KELLEY's experience includes work as counsel, and then general counsel, for a real estate title company in California, as president of a division of that company, and as a small business owner and operator whose business served the title industry.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1          2.      Blackstone International, Inc. ("Blackstone"), is an S Corporation formed

2    in the State of Nevada on or about October 26, 2000.  Since Blackstone's inception,

3    TROY X. KELLEY has been Blackstone's President and sole owner.

4          3.      Attorney Trustee Services, Inc. ("ATS"), is an S Corporation.  Originally,

5    TROY X. KELLEY's wife, D.D.K., was the President of ATS.  Subsequently, TROY X.

6    KELLEY became the President of ATS.  Through at least 2008, D.D.K. was the sole

7    owner of ATS.

8          4.      United National, LLC ("United National"), was a limited liability company

9    incorporated in Washington State on or about August 2, 2002.  TROY X. KELLEY was

10   United National's President.  Originally, Blackstone owned 50% of United National.  By

11   2008, Blackstone owned 79.3% of United National, ATS owned 18.1% of the company,

12   and a minority partner owned 2.6% of the company.  United National operated under the

13   name Post Closing Department (also known as "PCD") and provided reconveyance-

14   tracking services to real estate escrow companies.  On August 11, 2008, TROY X.

15   KELLEY cancelled United National's registration in Washington State.

16         5.      Fidelity National Title of Washington ("Fidelity") and Old Republic Title

17   ("Old Republic") were escrow companies that offered real estate settlement services in

18   Washington State.  United National d/b/a Post Closing Department, provided

19   reconveyance-tracking services to these escrow companies and others.

20         **B.      *The Reconveyance-Processing Industry***

21         6.      Generally, individuals who borrow money to purchase or refinance a home

22   ("borrowers") are required to grant a deed of trust to a trustee.  The trustee holds title to

23   the property on behalf of the lender, pursuant to that deed of trust, to secure repayment of

24   the loan.  When an underlying loan is paid in full, such as through the sale of the property

25   or through a refinancing, the lender sends the trustee proof of repayment, after which the

26   trustee transfers title back to the original borrower.  The process of transferring title back

27   to the borrower is called "reconveyance."  The reconveyance process is completed when

28   a deed of reconveyance is executed by the trustee and recorded in the recorder's office of

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 2

the county where the property is located.  Trustees may charge a fee to process a reconveyance (a "trustee fee"), and county recording offices generally charge a fee to record a reconveyance (a "county recording fee").

7.      Escrow companies performing real estate settlement services collect and disburse loan funds and sales proceeds, and facilitate documentation of real estate transactions, all in accordance with the escrow instructions of the parties to a real estate transaction.  As part of their service, escrow companies also facilitate the reconveyance process by collecting from borrowers fees in amounts sufficient to cover the potential costs associated with the reconveyance process.

8.      The potential costs associated with the reconveyance process include the cost of paying trustee fees and county recording fees (collectively, "reconveyance-processing fees"), as well as the cost of tracking reconveyances to ensure that they are completed ("reconveyance tracking").  During the period relevant to this Superseding Indictment, escrow companies typically collected between $100 and $150 per reconveyance (a "reconveyance fee") from borrowers to cover reconveyance-processing fees and reconveyance-tracking costs.

9.      In many cases, lenders processed reconveyances themselves, either for a minimal fee charged directly to the borrower as part of the borrower's loan payoff, or for no fee.  When lenders processed reconveyances, escrow companies did not need to pay reconveyance-processing costs, such as trustee fees or county recording fees.

10.     Rather than administer reconveyance fees and track reconveyances themselves, in some cases, escrow companies contracted with outside vendors that administered reconveyance fees and performed reconveyance-tracking services.  Post Closing Department was a vendor utilized by escrow companies to administer reconveyance fees, and track reconveyances, for the benefit of escrow parties.

## II.     Summary of Charges

11.     Between about 2003 and about June 2008, TROY X. KELLEY, through Post Closing Department, provided reconveyance-tracking services to Fidelity and Old

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 3

1  Republic.  TROY X. KELLEY represented to Fidelity and Old Republic that, in return

2  for a flat fee per reconveyance, Post Closing Department would receive and administer

3  the full amount of reconveyance fees collected by the escrow companies from borrowers

4  and (1) track the filing of reconveyances; (2) pay any necessary reconveyance-processing

5  fees, such as trustee fees and county recording fees; and (3) refund the unused portions of

6  the reconveyance fees back to the borrowers.  In reliance upon TROY X. KELLEY's

7  representations, Fidelity and Old Republic entrusted TROY X. KELLEY and Post

8  Closing Department with millions of dollars of reconveyance fees.  In truth and in fact,

9  TROY X. KELLEY lied to Fidelity and Old Republic and did not administer the

10  reconveyance fees as promised.  Contrary to his representations, TROY X. KELLEY did

11  not refund unused portions of reconveyance fees to borrowers, but instead fraudulently

12  retained, stole, and converted them to his own use.  Based upon this conduct, Count 1 of

13  this Superseding Indictment charges TROY X. KELLEY with Possession and

14  Concealment of Stolen Property, namely, approximately $1,463,171 of unused

15  reconveyance-processing fees that should have been refunded to borrowers, as well as

16  more than $5,000, of reconveyance-tracking fees that should have been refunded to

17  escrow companies or borrowers for transactions that were not complete when TROY X.

18  KELLEY closed Post Closing Department.

19      12.    In May 2008, class action lawsuits were filed on behalf of borrowers

20  against Fidelity and Old Republic, seeking, among other things, the return of

21  reconveyance fees charged by the escrow companies for services that were in fact

22  performed by lenders.  In June 2008, anticipating that borrowers and escrow companies

23  might seek the return of such fees from Post Closing Department, TROY X. KELLEY,

24  attempted to conceal the funds by moving them rapidly between numerous bank

25  accounts, and eventually depositing the funds into an account in the name of a newly-

26  created shell entity controlled by TROY X. KELLEY.  TROY X. KELLEY also

27  attempted to divert attention from himself, and to discredit and disqualify one of the

28  named plaintiffs in the civil suits, by issuing a refund check to him.  In about December

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 4

2009, Old Republic sued TROY X. KELLEY, seeking the return of unused reconveyance fees. In the course of the litigation with Old Republic, TROY X. KELLEY gave false testimony during a deposition, and lied in sworn declarations submitted to the Court. Based upon this conduct, Counts 2- 5 of this Superseding Indictment charge TROY X. KELLEY with False Declarations.

13.     Beginning in 2011, after all of the litigation against him had been resolved, TROY X. KELLEY sought ways to spend for his own benefit the unlawfully-retained reconveyance fees, while concealing and disguising the nature and source of his assets. As an elected official, and later, as a candidate for state-wide office, TROY X. KELLEY well knew that the sources of his income and assets would continue to be subject to reporting requirement and likely would be subject to additional scrutiny. Therefore, starting in 2011 and continuing through 2015, TROY X. KELLEY withdrew $245,000 annually from the pool containing his illicit proceeds, and, rather than pay himself directly, funneled the money through an account held in the name of his long-existing S Corporation, Blackstone. As a result, TROY X. KELLEY made it appear that a company he long had owned earned annually some form of legitimate income, while concealing and disguising and attempting to conceal and disguise the fact that TROY X. KELLEY was simply drawing down the accumulated proceeds he had unlawfully taken through his prior business, Post Closing Department. Based upon this conduct, Counts 6-10 of this Superseding Indictment charge TROY X. KELLEY with Money Laundering.

14.     Finally, TROY X. KELLEY engaged in a long-running scheme to avoid and reduce his taxes on the unlawfully-retained reconveyance fees. For the tax years between 2006 and 2008, TROY X. KELLEY fraudulently underreported United National's and his own gross receipts and income, and avoided declaring and paying taxes on the reconveyance fees that he had unlawfully retained. Beginning in 2011, after all of the litigation against him had been resolved, TROY X. KELLEY began withdrawing $245,000 annually from the pool of unlawfully-retained reconveyance fees. TROY X. KELLEY reported the $245,000 that he drew down annually as income to his

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  wholly-owned S Corporation, Blackstone.  For the 2011 and 2012 tax years, however,

2  TROY X. KELLEY sought to reduce his tax by fraudulently claiming as business

3  deductions, on Blackstone's return, personal and campaign-related expenditures that were

4  not legitimate business expenses.  Finally, when Internal Revenue Service (IRS) agents

5  interviewed TROY X. KELLEY in April 2013, TROY X. KELLEY falsely stated he

6  reported $245,000 of income in each of 2011 and 2012, because he was continuing to

7  perform reconveyance-tracking services and was only reporting income as he earned it.

8  Based upon this conduct, Counts 11-17 of this Superseding Indictment charge TROY X.

9  KELLEY with Corrupt Interference with Internal Revenue Laws, with Filing False

10  Income Tax Returns, and with False Statements to IRS Agents.

11  **III.    The Reconveyance-Fee Fraud Scheme**

12      *A.    The Fraud Relating to Fidelity*

13      15.    During 2003, TROY X. KELLEY entered into a business agreement with

14  Fidelity.  Both orally and in writing, TROY X. KELLEY represented that, for a flat fee of

15  $15 per file, Post Closing Department would (1) provide Fidelity reconveyance-tracking

16  services for real estate transactions in King and Snohomish Counties; (b) receive from

17  Fidelity the full amount of reconveyance fees entrusted to Fidelity by borrowers; and,

18  (c) where Post Closing Department was not required to use the full amount of those fees

19  to pay trustee fees and/or county recording fees, or its own $15 reconveyance-tracking

20  fee, return the unused portion of reconveyance fees to borrowers.

21      16.    A written agreement, signed by Fidelity's Operations Manager on October

22  9, 2003, defined Fidelity as the "Client," and borrowers as "Customers," and provided, in

23  relevant part:

24      Fees are as follows:  $15.00 post closing tracking fee per
    item.

25                       * * *

26      Payment Terms:

27      Client shall collect post closing fee and make check payable
    to PCD (leave the check to be picked up by representative
    and/or coordinator).  Expenses such as trustee fees and

28      recording fees that are associated with a file will be advanced

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 6

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

and charged to that file.  At the completion of the post closing documentation if extra funds are left over, PCD shall forward the funds to Customer, with sample letter attached.

17.     In reliance upon TROY X. KELLEY's representations and promises, beginning in 2003, Fidelity began using Post Closing Department to perform reconveyance-tracking work, and caused borrowers to authorize disbursement of funds from Fidelity to Post Closing Department for reconveyance processing and tracking. Fidelity provided Post Closing Department files accompanied by checks made payable to Post Closing Department in the full amount of the reconveyance fees that had been entrusted to Fidelity for reconveyance processing and tracking by borrowers.  TROY X. KELLEY and Post Closing Department employees subsequently cashed those checks, depositing the funds into an account at Columbia Bank that Post Closing Department used to hold funds received from Fidelity.  In doing so, TROY X. KELLEY and the employees caused wire communications to be transmitted in interstate commerce in order to effect the transactions.

18.     To track Fidelity's reconveyances, a Post Closing Department employee entered the data for each reconveyance into a line in a large spreadsheet.  Post Closing Department then tracked the reconveyances by logging onto county recorder's offices' websites to check the status of the reconveyances.  When a title was reconveyed, an employee noted the number assigned to the reconveyance in the spreadsheet.  Because the employees understood that Post Closing Department received a flat $15 fee per transaction tracked regardless of the amount of work involved, they did not use the spreadsheet to record the specific tasks performed on each file.

19.     Because major lenders processed the vast majority of the reconveyances Post Closing Department tracked, Post Closing Department generally did not need to perform additional work, or pay additional trustee fees or county recording fees, to effect reconveyances.  As a result, in the vast majority of cases, Post Closing Department received from Fidelity, and retained at the completion of the reconveyances, funds

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 7

1    entrusted to Fidelity to cover possible reconveyance-processing costs that were not

2    actually needed to pay a trustee fee or a county recording fee.

3        20.    By no later than in or about January 2006, TROY X. KELLEY devised a

4    scheme and artifice to defraud Fidelity and borrowers, to obtain money from Fidelity by

5    means of false and fraudulent representations, and to steal money from Fidelity and from

6    borrowers, namely to take and convert to his own use and benefit reconveyance-

7    processing fees that TROY X. KELLEY knew should have been refunded to borrowers.

8        21.    TROY X. KELLEY decided not to pay refunds to borrowers, all the while,

9    continuing to keep up a pretense that Post Closing Department was administering fees as

10   promised, and continuing to obtain from Fidelity fees entrusted to Fidelity by borrowers.

11   Unbeknownst to Fidelity and borrowers, and contrary to his representations and

12   promises, TROY X. KELLEY directed Post Closing Department employees to issue

13   refund checks in limited circumstances, typically, when an escrow company or a

14   borrower complained that the borrower had not received a refund to which the borrower

15   was entitled.

16       22.    To conceal further from Fidelity the fact that Post Closing Department was

17   keeping unused reconveyance-processing fees, TROY X. KELLEY falsely and

18   fraudulently represented to Fidelity that Post Closing Department continued to charge

19   only a flat $15 fee per transaction tracked.

20       23.    For example, on February 16, 2006, TROY X. KELLEY sent an email to

21   an employee at Fidelity, advising that Ticor Title was raising its trustee fees to $120,

22   suggesting that Fidelity might want to do the same, and noting that PCD would hold only

23   $105 in processing fees "after our $15 fee."

24       24.    Similarly, on May 9, 2007, TROY X. KELLEY caused an employee to

25   send an email to an employee at Fidelity, stating that Post Closing Department collected

26   $15 per file, and that, in tracking each file, Post Closing Department sent letters and made

27   telephone calls.

28

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 8

25.    And on July 31, 2007, TROY X. KELLEY sent an email to an employee at Fidelity, stating that he wanted "to confirm our fees are $15 per deed of trust tracked and we hold what you direct us to in order that the trustee gets paid and records the reconveyance." In reliance upon these false representations, Fidelity continued to cause borrowers to instruct at closing that reconveyance fees entrusted to Fidelity be disbursed to Post Closing Department, and Fidelity continued to disburse such fees to Post Closing Department.

26.    In approximately March 2008, Fidelity decided to stop using Post Closing Department to track reconveyances. After being notified of that fact, on March 14, 2008, TROY X. KELLEY sent an employee at Fidelity an email in which he offered to continue tracking Fidelity's reconveyances for a flat fee of $15 per transaction tracked, while allowing Fidelity to retain the remainder of the reconveyance fees. The email stated, in relevant part:

> I just wanted to let you know that there is a reconveyance service model that allows you to hold the income generated and we are paid though a monthly invoice that is $15 per file.

27.    On April 7, 2008, TROY X. KELLEY sent a similar email to another employee at Fidelity, stating, in relevant part:

> I want to confirm the option that we can track new payoffs . . . . Our price is still only $15 per item and can be invoiced monthly. . . . We operate this way for six counties in Oregon and we even advance substantial recording fees on Fidelity's behalf. We do all the work after close, and Fidelity holds the money.

Despite TROY X. KELLEY's emails, Fidelity stopped using Post Closing Department in March 2008.

28.    After Fidelity stopped using Post Closing Department to provide reconveyance-tracking services, TROY X. KELLEY terminated one of the Post Closing Department employees who had been primarily responsible for performing the work for Fidelity. In approximately May 2008, TROY X. KELLEY picked up the Post Closing

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 9

1   Department documents remaining at the employee's residence, and caused all Post

2   Closing Department-related files to be deleted from the employee's computer.

3       29.     Because major lenders had processed the vast majority of the

4   reconveyances Post Closing Department tracked for Fidelity, Post Closing Department

5   retained a substantial amount of unused reconveyance-processing fees.  Between January

6   2006 and March 2008, Fidelity asked Post Closing Department to track approximately

7   21,158 reconveyances.  Of these, Fidelity collected reconveyance fees in an amount

8   designed to cover reconveyance-processing costs, as well as reconveyance-tracking costs,

9   in approximately 18,208 cases.

10      30.     By March 2008, the vast majority of the files tracked had reconveyed.

11  With respect to those reconveyed transactions, Post Closing Department had been

12  required to issue only approximately 460 checks to pay reconveyance-processing fees.

13  Accordingly, Post Closing Department should have refunded unused reconveyance-

14  processing fees to thousands of borrowers.  In fact, however, Post Closing Department

15  had issued only approximately 25 refund checks, totaling approximately $4,340, to

16  borrowers from the Columbia Bank account that it used to conduct Fidelity business.

17  (Post Closing Department had issued approximately 423 additional checks to pay

18  reconveyance-processing fees from bank accounts not related to specific escrow

19  companies, and had issued approximately 34 additional refund checks, totaling

20  approximately $8,837, from such accounts.  Some of those checks may have related to

21  borrowers in transactions that Post Closing Department tracked for Fidelity.)

22      31.     Instead of refunding unused reconveyance-processing fees to borrowers,

23  TROY X. KELLEY retained the vast majority of these fees in the Columbia Bank

24  account from which he conducted Fidelity business.  As a result, the balance in this

25  account, which was $745,121 on January 1, 2006, had grown to $2,361,181 by June

26  2008.  (In addition, during the same period, although Post Closing Department was

27  entitled to only approximately $317,370 for reconveyance-tracking services that it

28

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 10

performed for Fidelity, TROY X. KELLEY transferred approximately $443,006 from the account to his own personal account at Bank of America.)

**B.** **The Fraud Relating to Old Republic**

32.     By no later than April 2006, TROY X. KELLEY devised a scheme and artifice to defraud Old Republic and borrowers, to obtain money from Old Republic by means of false and fraudulent representations, and to steal money from Old Republic and borrowers.  This scheme was functionally-identical to the scheme to defraud Fidelity.

33.     On or about April 10, 2006, TROY X. KELLEY met with a Senior Vice President of Old Republic.  TROY X. KELLEY falsely and fraudulently represented that, for a flat fee of $20.00 per reconveyance, Post Closing Department would (a) provide reconveyance-tracking services for real estate transactions in which Old Republic acted as the escrow agent; (b) receive from Old Republic the full reconveyance fees entrusted to Old Republic by borrowers; and, (c) where Post Closing Department was not required to use the full reconveyance fees to pay trustee fees and county-recording fees, or its own $20 reconveyance-tracking fee, it would return the unused reconveyance-processing fees to borrowers.

34.     On or about the following day, TROY X. KELLEY sent the Old Republic officer an email in which TROY X. KELLEY stated that he had created a refund letter for a client who "wanted to hit the issue of the refund and integrity extra hard."  The letter provided, in relevant part:

> To ensure that the reconveyance is done properly, Old
> Republic collects a Post Closing fee for each reconveyance.
> A portion of this fee is charged to track county records for
> your reconveyance and the balance is charged so that Old
> Republic or another trustee can process your reconveyance if
> additional [funds] are needed.  In your case, the county
> records show the reconveyance document has been recorded,
> so we can close our file and we are refunding you the excess
> processing fee.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

35.     In May 2006, Old Republic and Post Closing Department signed an agreement for Post Closing Department to provide reconveyance-tracking services to Old Republic.  The agreement provided, in relevant part:

> Fees are as follows:
>
> $20.00 post closing tracking fee per item,
>         fee includes management of funds due trustees &
>         client refunds
>                           * * *
> Additional Terms and Conditions:
>
> PCD shall provide client with monthly progress reports
> of reconveyance activity on each of client's files being
> tracked as well as an accounting on all funds received
> from client that have been disbursed and/or refunded
> to principals.

36.     In truth and in fact, however, TROY X. KELLEY did not intend for Post Closing Department to issue refund checks to the vast majority of borrowers to whom refunds were owed.  Instead, TROY X. KELLEY intended to take and convert to his own benefit reconveyance-processing fees that TROY X. KELLEY knew should have been refunded to borrowers.

37.     In June 2006, in reliance upon TROY X. KELLEY's representations and promises, Old Republic began using Post Closing Department to provide reconveyance-tracking services.  Old Republic caused borrowers to instruct at closing that reconveyance fees entrusted to Old Republic be disbursed to Post Closing Department, and Old Republic disbursed such fees to Post Closing Department.

38.     Old Republic provided Post Closing Department files accompanied by checks made payable to Post Closing Department in the full amount that had been entrusted to Old Republic for reconveyance processing and tracking by borrowers.  TROY X. KELLEY and Post Closing Department employees subsequently cashed those checks, depositing the funds into an account at Columbia Bank that Post Closing Department used to hold funds received from Old Republic.  In doing so, TROY X.

1  KELLEY and the employees caused wire communications to be transmitted in interstate
2  commerce in order to effect the transactions.

3      39.    To track Old Republic's reconveyances, Post Closing Department
4  employees entered the data for each reconveyance into a line in a large spreadsheet. Post
5  Closing Department then tracked the reconveyances by logging onto county recorder's
6  offices' websites to check the status of the reconveyances. When a title was reconveyed,
7  an employee noted the number assigned to the reconveyance in a spreadsheet. Because
8  employees understood that Post Closing Department received a flat $20 fee per
9  transaction tracked regardless of the amount of work involved, the employees did not use
10  the spreadsheet to record the specific tasks they performed on each file.

11      40.    Unbeknownst to Old Republic and borrowers, and contrary to his
12  representations and promises, TROY X. KELLEY directed Post Closing Department
13  employees to issue refund checks in only two limited situations. First, when an escrow
14  company or a borrower complained that the borrower had not received a refund to which
15  the borrower was entitled, TROY X. KELLEY directed an employee to issue a refund
16  check to that borrower. Second, on rare occasions, TROY X. KELLEY directed Post
17  Closing Department employees to issue small batches of refund checks. TROY X.
18  KELLEY did this either to respond to questions from Old Republic, or to create a defense
19  in the event that he subsequently was questioned about Post Closing Department's
20  actions.

21      41.    To conceal from Old Republic the fact that Post Closing Department was
22  keeping unused reconveyance-processing fees, TROY X. KELLEY falsely and
23  fraudulently represented to Old Republic that Post Closing Department continued to
24  charge only a flat $20 fee per transaction tracked. For example, on March 26, 2007, a
25  representative of Old Republic emailed Post Closing Department asking, among other
26  things, "[d]o you have a fee schedule . . . ?" TROY X. KELLEY caused an employee of
27  Post Closing Department to respond, "[t]he fee is $20 flat for each item (each DOT to be
28  tracked)."

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 13

42. On July 26, 2007, TROY X. KELLEY again represented that Post Closing Department charged a flat fee in an email to an Old Republic employee in which he stated, in relevant part:

> It seems that most companies are raising their trustee (recon) fee by $10 to offset the two County Recorder's increases. Thus they are having us increase the funds held by $10. Our $20 tracking fee does NOT change.

43. At some point, Old Republic employees in fact requested proof that Post Closing Department was using reconveyance fees appropriately. Thereafter, TROY X. KELLEY regularly directed a Post Closing Department employee to produce "zeroed out" spreadsheets. These spreadsheets showed that all reconveyance fees relating to borrowers whose reconveyances were complete had been (1) paid out as third-party fees to trustees or county recorder's offices, or (2) refunded to borrowers. TROY X. KELLEY provided the employee the check number that supposedly had been used to make one payment, and directed that the employee have the spreadsheets show that payments relating to other borrowers had been made using the next-in-sequence checks.

44. After the Post Closing Department employee prepared "zeroed out" spreadsheets that falsely showed that large numbers of third-party and refund payments had been made, TROY X. KELLEY caused the spreadsheets to be provided to the Old Republic personnel who had requested the information as supposed proof that Post Closing Department was handling reconveyance fees appropriately. In truth and in fact, TROY X. KELLEY well knew that Post Closing Department had not made the payments to trustees and county recorder's offices shown in the spreadsheets, and that it was not paying refunds as required.

45. Because major lenders processed the vast majority of the reconveyances that Post Closing Department tracked for Old Republic, Post Closing Department retained a substantial amount of unused reconveyance-processing fees. Between June 2006 and June 2008, Old Republic asked Post Closing Department to track approximately 11,773 reconveyances. Of these, Old Republic collected reconveyance

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 14

1 | fees in an amount designed to cover reconveyance-processing costs, as well as
2 | reconveyance-tracking costs, in approximately 9,072 cases.

3 |     46.    By June 2008, more than 3,500 of the reconveyances that Post Closing
4 | Department was tracking for Old Republic had been completed. With respect to those
5 | reconveyed transactions, Post Closing Department had been required to issue only
6 | approximately 150 checks to pay reconveyance-processing fees. Accordingly, Post
7 | Closing Department should have refunded unused reconveyance-processing fees to
8 | thousands of borrowers. In fact, however, Post Closing Department issued only
9 | approximately 30 refund checks, totaling approximately $5,660, to borrowers. (Post
10 | Closing Department had issued approximately 423 additional checks to pay
11 | reconveyance-processing fees from bank accounts not related to specific escrow
12 | companies, and had issued approximately 34 additional refund checks, totaling
13 | approximately $8,837, from such accounts. Some of those checks may have related to
14 | borrowers in transactions that Post Closing Department tracked for Old Republic.)

15 |     47.    Instead of refunding unused reconveyance-processing fees to borrowers,
16 | TROY X. KELLEY retained the vast majority of these fees in the Columbia Bank
17 | account from which he conducted Old Republic business. As a result, the balance in this
18 | account had grown to $888,949 by June 2008. (In addition, between June 2006 and June
19 | 2008, TROY X. KELLY transferred approximately $95,000 from the account to his
20 | personal account at Bank of America.)

21 | **IV.    The Tax Fraud Scheme**

22 |     48.    Under federal law relating to taxation, income must be reported in the tax
23 | year in which it is received or earned.

24 |     49.    IRS Form 1065, U.S. Return of Partnership Income ("Form 1065"), is an
25 | IRS form used to report the income and deductions of a partnership. Generally,
26 | partnership income flows through to partners, according to their share in the partnership.
27 | United National reported its income as a partnership using IRS Form 1065. From 2006

28 |

1  through 2008, United National's income flowed through to its partners, including
2  Blackstone and ATS.

3       50.    IRS Form 1120S, U.S. Income Tax Return for an S Corporation ("Form
4  1120S") is an IRS form used to report the income and deductions of an S Corporation.
5  S Corporation income flows through to the corporation's owners, according to their share
6  in the S Corporation. Blackstone and ATS reported their income using Form 1120S.
7  From 2006 through 2008, Blackstone's income flowed through to its sole owner, TROY
8  X. KELLEY, and ATS' income flowed through to its sole owner, D.D.K.

9       51.    IRS Form 1040, U.S. Individual Income Tax Return ("Form 1040"), is an
10 IRS form used by individual taxpayers to report their annual income, deductions, and
11 credits, and their tax due and owing.

12      52.    Having fraudulently obtained and stolen funds from Fidelity, Old Republic,
13 and borrowers, TROY X. KELLEY sought to avoid payment of taxes on those funds. In
14 addition, TROY X. KELLEY realized that the escrow companies and borrowers might
15 seek the return of their funds. Accordingly, TROY X. KELLEY particularly sought to
16 avoid payment of taxes on the funds until after any such potential claims were resolved.
17 As a result, for tax years between 2006 and 2008, TROY X. KELLEY underreported the
18 income he earned.

19      53.    On or about February 28, 2007, TROY X. KELLEY filed a Form 1065
20 partnership return for United National for the tax year 2006. On or about February 28,
21 2008, TROY X. KELLEY filed a Form 1065 partnership return for United National for
22 the tax year 2007. And, on or about October 9, 2008, TROY X. KELLEY filed a Form
23 1065 partnership return for United National for the tax year 2008.

24      54.    These Forms 1065 were false in that they underreported income United
25 National earned between 2006 and 2008 by an aggregate amount of more than
26 $3,000,000. By underreporting this income, which ultimately flowed through to his and
27 D.D.K's joint personal Forms 1040, TROY X. KELLEY reduced the individual income
28

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 16

1 taxes he was required to pay for tax years 2006 through 2008 by approximately

2 $1,000,000.

3      55.    In particular, the Form 1065 that TROX X. KELLEY filed for United

4 National for the tax year 2008, was false in that it underreported income United National

5 earned during 2008 by in excess of approximately $304,019. By underreporting this

6 income, which ultimately flowed through to his and D.D.K.'s personal Form 1040

7 Individual Income Tax Return, TROY X. KELLEY reduced the individual income taxes

8 he was required to pay for tax year 2008 by approximately $100,000.

9 **V.    Obstruction of Civil Lawsuits**

10      56.    On May 14, 2008, class action lawsuits were filed in the United States

11 District Court for the Western District of Washington against Fidelity and Old Republic.

12 The class actions, *Cornelius v. Fidelity National Title Insurance*, C08-0754MJP (W.D.

13 Wash.), and *McFerrin v. Old Republic Title*, C08-5309BHS (W.D. Wash.), alleged,

14 among other things, that Fidelity and Old Republic collected reconveyance-processing

15 fees from borrowers, that, even though they went unused, "[n]o portion of the

16 reconveyance processing fees [were] credited or returned with the final settlement," and

17 that the two companies "kept these duplicative and unearned sums for no settlement

18 services rendered . . . ." TROY X. KELLEY learned of the existence of these class action

19 lawsuits no later than the day after they were filed, that is, May 15, 2008.

20     **A.    *TROY X. KELLEY Falsely Claims that Post Closing Department***

21               ***Previously Provided a Refund to F.C.***

22      57.    In *Cornelius v. Fidelity National Title*, Post Closing Department had

23 performed the tracking services for the lead plaintiff, F.C.'s, real estate transaction. As

24 TROY X. KELLEY well knew, Fidelity had delivered to Post Closing Department the

25 $280 in reconveyance fees entrusted to Fidelity by F.C., to cover two reconveyances

26 involved in F.C.'s refinance.

27      58.    As TROY X. KELLEY also well knew, despite the fact that Post Closing

28 Department had not been required to pay any trustee fees or county recording fees, Post

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 17

Closing Department had kept the entire reconveyance fee, rather than refund all but the $30 to which it was entitled for tracking two reconveyances. To divert attention from this fact, and thereby seek to avoid being made a defendant in the class action lawsuits, and also to discredit and disqualify F.C. as a plaintiff, TROY X. KELLEY sought to convince F.C. that Post Closing Department had timely sent him a refund of his reconveyance-processing fees.

59.    On May 16, 2008, at 9:17 a.m., TROY X. KELLEY used an ATM at a Bank of America branch near his home to withdraw $300 in cash from his personal Bank of America account. TROY X. KELLEY immediately traveled to a nearby Washington Mutual Bank branch. There, at 9:27 a.m., TROY X. KELLEY used the cash to purchase a $250 cashier's check payable to F.C. To avoid fees associated with the purchase of the cashier's check, TROY X. KELLEY provided Washington Mutual Bank with the account number for his Washington Mutual Bank campaign finance account in the name of Friends of Troy Kelley. Finally, because he paid for this check using money withdrawn from his personal account, TROY X. KELLEY wrote a check dated May 16, 2008, on the Post Closing Department account at Columbia Bank that he used for Fidelity business, and made it payable to himself in the amount of $250. On the memo line, TROY X. KELLEY wrote the word "reimbursement."

60.    TROY X. KELLEY caused the $250 cashier's check that he had purchased to be mailed to F.C. In an accompanying letter, TROY X. KELLEY acknowledged that Post Closing Department was entitled to a flat reconveyance-tracking fee of $15 per reconveyance, and falsely claimed that Post Closing Department previously had refunded the remainder of F.C.'s reconveyance fees to F.C., but that F.C. had failed to cash Post Closing Department's check. The letter, which was not signed, provided in relevant part:

> Dear [F.C.]:
>
> A review of our records shows that you did not cash our check of January 7, 2008. The letter mailed to you was not returned by the post office, and you have not contacted Fidelity National Title or The Post Closing Department since

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 18

the time your escrow closed. That check is now stale dated and you should not cash it.

We are enclosing an official bank check to zero out your account balance, and mailing it to you with proof of mailing.

The enclosed official bank check is for $250. Fidelity National Title collected $140 on the payoff of each deed of trust. $15 was charged to track each reconveyance. There was a balance on each deed of trust of $125 when the beneficiary secured the reconveyance. This recording of the reconveyance may have been after being contacted by the Post Closing Department to confirm that the document was being processed. Thus, you are being refunded $125 for each deed of trust that was paid off in escrow for a total of $250.

61.     TROY X. KELLEY also included with the cashier's check a copy of the letter that Post Closing Department allegedly had sent to F.C. on January 7, 2008. In the letter, TROY X. KELLEY again acknowledged that Post Closing Department was entitled to retain only a flat $15 tracking fee. TROY X. KELLEY fraudulently placed a slightly-incorrect address in the letter's heading in an attempt to create a plausible explanation for the fact that it never had been delivered to F.C.

**B.      *TROY X. KELLEY Conceals Post Closing Department's Money***

62.     Within a month after learning of the class action lawsuits, TROY X. KELLEY sought to conceal $3,782,226 held in Post Closing Department's Columbia Bank accounts by moving the money through a series of convoluted wire transfers through various newly-opened bank accounts. As part of this series of transfers, TROY X. KELLEY transferred the money out of the State of Washington and into accounts opened in the name of entities not associated with United National or Post Closing Department.

63.     On June 10, 2008, TROY X. KELLEY opened an account at Wells Fargo Bank in the name of United National. On June 12, 2008, TROY X. KELLEY wire transferred (1) $2,361,181 from the Columbia Bank account that he had used for Fidelity

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 19

1   business, (2) $888,949 from the Columbia Bank account that he had used for Old

2   Republic business, and (3) $532,096 from the Columbia Bank account number that he

3   had used for Stewart Title business, for a combined total of $3,782,226, into the newly

4   opened account at Wells Fargo Bank.

5         64.    On June 12, 2008, TROY X. KELLEY opened an account at U.S. Bank in

6   the name of United National.  On June 13, 2008, TROY X. KELLEY wire transferred

7   $3,785,667 from the United National account at Wells Fargo Bank to the newly-opened

8   United National account at U.S. Bank.

9         65.    On June 17, 2008, TROY X. KELLEY opened an account at Nevada State

10   Bank in the name of Blackstone.  On June 18, 2008, TROY X. KELLEY wire transferred

11   $3,784,619 from the United National account at U.S. Bank to the newly-opened

12   Blackstone account at Nevada State Bank in Nevada.

13         66.    On June 23, 2008, TROY X. KELLEY formed Berkeley United, LLC

14   ("Berkeley United"), a Nevada limited liability company.  At approximately the same

15   time, TROY X. KELLEY formed Wellington Trust, a trust organized under the laws of

16   Belize.  Although TROY X. KELLEY did not technically own Wellington Trust, for all

17   practical purposes, TROY X. KELLEY controlled the trust, which operated for his

18   benefit.  Wellington Trust owned 99% of Berkeley United.  Blackstone owned the

19   remaining 1%.

20         67.    On June 26, 2008, TROY X. KELLEY opened an account at Vanguard in

21   the name of Berkeley United.  On June 27, 2008, TROY X. KELLEY transferred

22   $3,634,673 from the Blackstone account at Nevada State Bank, in Nevada, to the newly-

23   opened Berkeley United account at Vanguard, in Pennsylvania.

24         68.    Between January 2006 and June 2008, Post Closing Department failed to

25   refund to borrowers (in the case of completed reconveyances) or to Fidelity or Old

26   Republic (in the case of reconveyances that had not yet been completed when Post

27   Closing Department ceased operations), a total of at least approximately $2,964,679.  Of

28   this amount, at least approximately $1,618,744 was included in money that TROY X.

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 20

1  KELLEY transferred to the Blackstone account at the Bank of Nevada on June 18, 2008,

2  and at least approximately $1,463,171 was included in the money that TROY X.

3  KELLEY held in the Berkeley United account at Vanguard on January 1, 2011.

4       **C.**    ***TROY X. KELLEY Shuts Down Post Closing Department***

5       69.    In approximately June 2008, TROY X. KELLY transferred Post Closing

6  Department's two remaining employees in the State of Washington from Post Closing

7  Department's payroll to the payroll of ATS.  On the evening of June 25, 2008, a fire was

8  reported at the Stewart Title offices in Everett, Washington.  By 11:00 p.m., on June 25,

9  2008, Stewart Title had burned to the ground.  TROY X. KELLEY subsequently

10  represented that all of Post Closing Department's records had been destroyed in that fire

11  and in a subsequent crash of his computer.

12       70.    On August 11, 2008, having shut down Post Closing Department's

13  operations in the States of Washington and Oregon, TROY X. KELLEY filed a

14  Certificate of Withdrawal/Cancellation with the Washington State Secretary of State,

15  thereby immediately canceling the registration of United National, d/b/a Post Closing

16  Department.

17       71.    On September 23, 2008, after learning of the existence of Post Closing

18  Department, the class action plaintiffs served TROY X. KELLEY with subpoenas

19  demanding that he produce books and records.  On that same date, to ensure his ability to

20  further conceal the funds he previously had hidden from the class action litigants, TROY

21  X. KELLEY submitted to Vanguard an International Wire Option Form, providing him

22  with the option of wiring funds from the Berkeley United account at Vanguard, to an

23  account in the name of Wellington Trust at Atlantic International Bank in Belize.

24       **D.**    ***Old Republic Sues TROY X. KELLEY, and TROY X. KELLEY Seeks to***
25             ***Conceal from Old Republic the Location of its Funds and Makes False***
26             ***Declarations in a Deposition***

27       72.    On March 3, 2009, counsel for class-action defendant Old Republic filed a

28  third-party complaint against TROY X. KELLEY charging, among other things, that, by

failing to refund unused reconveyance-processing fees to borrowers, Post-Closing

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 21

1   Department had breached its agreement with, and been unjustly enriched to the detriment

2   of, Old Republic.

3       73.   Between March 2009, and September 8, 2009, counsel for Fidelity sought

4   to locate the stolen funds that TROY X. KELLEY had concealed.  They did so by issuing

5   subpoenas to Columbia Bank, Wells Fargo Bank, Washington Mutual Bank, U.S. Bank,

6   HSBC, and, ultimately, on September 8, 2009, to the Vanguard Group.

7       74.   On July 9, 2009, and October 29, 2009, after finding that Old Republic,

8   which had disclosed the payment of reconveyance fees to Post Closing Department in the

9   settlement document that the plaintiffs signed at their closing, had not breached any

10   agreement with, or duty of good faith to, the plaintiffs, the Court dismissed the class

11   action lawsuit against Old Republic.  Likewise, on April 1, 2010, the Court dismissed the

12   class action lawsuit against Fidelity.

13       75.   On December 10, 2009, Old Republic filed a new lawsuit against TROY X.

14   KELLEY, in King County Superior Court.  On June 6, 2010, that lawsuit was removed to

15   the United States District Court for the Western District of Washington, *Old Republic*

16   *Title, Ltd.  v. Troy X. Kelley, et al.,* No. C10-0038JLR (W.D. Wash.).  All of Old

17   Republic's claims stemmed from its core allegation that TROY X. KELLEY had agreed,

18   in June 2006, to perform reconveyance-tracking services for a flat fee of $20 per escrow

19   transaction, and to refund all other unused reconveyance fees to borrowers, but that

20   TROY X. KELLEY instead improperly had kept the unused fees.

21       76.   As part of the civil discovery in the *Old Republic Title* case, written

22   interrogatories were served upon TROY X. KELLEY.  A key objective of these

23   interrogatories was locating the reconveyance fees that were entrusted to Old Republic

24   and then provided to Post Closing Department pursuant to borrowers' escrow

25   instructions.  In his responses to those interrogatories, TROY X. KELLEY repeatedly

26   sought to conceal the Berkeley United account at Vanguard that held the fees.

27       77.   Thus, Interrogatory 15 of Old Republic's First Set of Interrogatories

28   required TROY X. KELLEY to disclose all entities in which he held an ownership

interest. On February 22, 2010, TROY X. KELLEY submitted a response that objected to the interrogatory in general terms and did not provide any substantive response. On March 25, 2010, TROY X. KELLEY submitted a supplemental response stating that his response to another interrogatory (which he described as Interrogatory 15, but by which he likely intended to refer to Interrogatory 16) responded to the question. On July 26, 2010, TROY X. KELLEY again supplemented his response, stating:

- The Kelleys were and are the sole owners of the stock of Blackstone International, Inc.;
- the Kelleys were the sole owners of the LLC interest in United National, LLC, prior to its cancellation;
- the Kelleys were the sole owners of the LLC interest in United National 14, LLC, prior to its cancellation;
- the Kelleys were and are the sole owners Attorney Trust Services, Inc.;
- the Kelleys control the education foundation and Mr. Kelley controls and the campaign organization, but they do not have an "ownership interest" in them.

In truth and in fact, as TROY X. KELLEY well knew, Blackstone held a 1% ownership interest, and Wellington Trust, which for all practical purposes TROY X. KELLEY controlled, held the remaining 99% interest, in Berkeley United, the entity that held the Vanguard account into which TROY X. KELLEY had moved Old Republic's funds.

78.     Interrogatory 16 required TROY X. KELLEY to disclose all entities in which he was an officer. On March 25, 2010, TROY X. KELLEY responded to this interrogatory, stating:

Mr. Kelley has formed the following entities, . . . :

Blackstone International Inc. 2000 – present.  (President)
United National LLC, 2002-2008, cancelled.  (President)
United National 14 LLC, 2004-2008, cancelled.  (President)
Attorney Trustee Services Inc, 2003-present.  (President)
Kelley Education Foundation, 2007-present, very small, give money for education or internships (Chairman)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  Friends of Troy Kelley, political association for campaign, 2006-present
2  (Candidate)

3  In truth and in fact, as TROY X. KELLEY well knew, TROY X. KELLEY also was the

4  President of Berkeley United, the entity that held the Vanguard account into which

5  TROY X. KELLEY had moved Old Republic's funds.

6       79.    Interrogatory 18 required TROY X. KELLEY to disclose all bank accounts

7  into which he had "deposited any money originally received from Old Republic."  On

8  March 25, 2010, TROY X. KELLEY responded to this interrogatory, stating "[t]he only

9  account used for the deposit of checks from ORT was #[\*\*\*\*\*\*]1629 at Columbia Bank.

10  The account was in the name of United National, LLC; dba Post Closing Department."

11  On July 26, 2010, TROY X. KELLEY supplemented his Response to Interrogatory 18, as

12  follows:

13        RESPONSE:  As noted above, the only account used for the
14        deposit of checks was Account No. [\*\*\*\*\*\*]1629 at
15        Columbia Bank.  From time to time, as reflected in the
      Columbia bank records, United National would transfer funds
16        representing service fees from this account to Account No.
17        [\*\*\*\*\*\*]5529 at Columbia Bank.

18        In addition, as also reflected in the Columbia Bank records, at
      the conclusion of United National's reconveyance work for
19        Old Republic, United National transferred the remaining
20        funds in Account No. [\*\*\*\*\*\*]1629 to Wells Fargo Account
      No. [\*\*\*-\*\*\*]3310, another business account held by United
21        National.  At that point, the funds were commingled with
22        other funds that United National had received from other
      business operations, including other reconveyance business.
23

24  In truth and in fact, as TROY X. KELLEY well knew, Berkeley United held a Vanguard

25  account into which TROY X. KELLEY had transferred funds entrusted to Old Republic

26  and then delivered to Post Closing Department pursuant to borrowers' escrow

27  instructions.  By his response to Interrogatory 18, TROY X. KELLEY sought to conceal

28  that bank account.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    80.    On August 2, 2010, TROY X. KELLEY was deposed in *Old Republic Title,*
2  *Ltd. v. Troy Kelley et al.* During the deposition, counsel for Old Republic directly
3  confronted TROY X. KELLEY about the funds TROY X. KELLEY had concealed in the
4  Vanguard account he had opened in the name of Berkeley United, inquiring "[w]hy were
5  the funds transferred to Berkeley United?" On January 28, 2011, TROY X. KELLEY
6  supplemented his prior interrogatory responses, admitting both that he had transferred
7  Old Republic's funds to a Vanguard account held by Berkeley United, and that he was
8  the President of Berkeley United.

9    81.    During that same deposition, TROY X. KELLEY also provided false
10  testimony concerning other matters. Thus, TROY X. KELLEY falsely testified that he
11  had negotiated the right to charge Old Republic additional fees beyond the $20 fee per
12  transaction. TROY X. KELLEY falsely testified that Post Closing Department's
13  spreadsheets identified and broke down the amounts of these individual fees for each
14  transaction. And TROY X. KELLEY falsely testified that he did not send the letter to
15  F.C. after the class action lawsuits were filed, or ask anyone to do so.

16    82.    During that same deposition, TROY X. KELLEY also testified that, after
17  shuttering Post Closing Department, he had performed a final reconciliation of all of the
18  work done by Post Closing Department for each of its escrow clients. TROY X.
19  KELLEY further testified that Post Closing Department was entitled to keep the money
20  in the Berkeley United account as "fees earned" for "services provided." TROY X.
21  KELLEY also testified that he had not paid tax on this money because, although Post
22  Closing Department had "earned" the money, the income had not yet been "realized."

23  **VI.    Continuation of the Tax Fraud Scheme**

24    83.    On May 3, 2011, Old Republic and TROY X. KELLEY settled *Old*
25  *Republic Title, Ltd. v. Troy Kelley et al.* Following the settlement TROY X. KELLEY
26  paid Old Republic $1,050,000 drawn from the money in the Berkeley United account at
27  Vanguard, in order that Old Republic could refund the money to borrowers.

28

84.     After he settled *Old Republic Title, Ltd. v. Troy Kelley et al.*, TROY X. KELLEY maintained approximately $2,581,653 of the funds he had concealed during June 2008 in the Berkeley United account at Vanguard.  Beginning in 2011, TROY X. KELLEY transferred $245,000 per year to accounts he controlled, which he then reported as income on Forms 1120S he filed on behalf of Blackstone.  TROY X. KELLEY sought to evade the full taxes due and owing on the reported income, however, by fraudulently deducting various items as business expenses, knowing full well that the deductions were not for legitimate business expenses.

85.     On or about June 3, 2011, a month after the settlement in *Old Republic Title, Ltd. v. Troy Kelley et al.*, TROY X. KELLEY wired $245,030 from the Berkeley United account at Vanguard to a Berkeley United account at Wells Fargo Bank.  On June 7, 2011, TROY X. KELLEY issued a check on the Wells Fargo Berkeley United account, in the amount of $245,000, to Blackstone.  TROY X. KELLEY deposited the check into an account at Columbia Bank in the name of Blackstone.

86.     On or about February 28, 2012, TROY X. KELLEY filed a Form 1120S for Blackstone for the tax year 2011.  That form stated that Blackstone's business was "[i]nformation [s]ervices," and described its product or service as "[d]ocument [t]racking."  TROY X. KELLEY declared that the company made gross profits of $245,000 for tax year 2011.  Blackstone's declared income for 2011, however, was offset by business expense deductions that totaled $66,147.

87.     According to an attached Form 4562 Depreciation and Amortization, approximately $28,535.32 of the declared deductions consisted of depreciation of two vehicles, including a new vehicle purchased in 2011.  TROY X. KELLEY indicated in Form 4562 that both vehicles were used 100% for the business.  The remaining business deductions were itemized in a personally-prepared schedule entitled "Profit & Loss Statement," and appended to Blackstone's return.  The schedule noted, for example, $5,162.21 in fuel expenses, $8,830.40 in business travel, $3,065.48 in conference

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1 | education expenses, $7,402.12 in sales expenses, and $2,974.35 for subscriptions and
2 | books.

3 | 88.  In truth and fact, as TROY X. KELLEY well knew, many of the expenses
4 | that TROY X. KELLEY declared as business deductions on Blackstone's Form 1120S
5 | were personal expenses, and the expenses were not expenses associated with any
6 | business that Blackstone had engaged in during the tax year 2011.

7 | 89.  On about January 6, 2012, TROY X. KELLEY issued a check on the
8 | Berkeley United account at Vanguard, in the amount of $245,000, to Blackstone, which
9 | he deposited into Blackstone's account at Columbia Bank.  On about February 1, 2012,
10 | TROY X. KELLEY transferred the remaining $2,090,818 in the Berkeley United account
11 | at Vanguard to an account at Vanguard in the name of Blackstone.

12 | 90.  On or about February 2, 2013, TROY X. KELLEY filed a Form 1120S on
13 | behalf of Blackstone for the tax year 2012, in which he declared gross profits of
14 | $245,000, for Blackstone.  As with the previous year's form, that form stated that
15 | Blackstone's business was "[i]nformation [s]ervices," and described its product or service
16 | as "[d]ocument [t]racking."  Blackstone's declared income in 2012 was offset by
17 | business-expense deductions totaling $60,425.

18 | 91.  Attached to the 2012 Form 1120S was a personally-prepared schedule
19 | itemizing the various categories of claimed business expenses.  The schedule noted,
20 | among other things, $5,953.85 in fuel costs, $12,573.81 in business travel, $4,979.40 in a
21 | category entitled "conference education," $9,975.04 in sales expenses, and $6,270 in
22 | depreciation for a vehicle.  On an attached Form 4562, which detailed the depreciated
23 | vehicle, TROY X. KELLEY noted that the vehicle claimed was used 100% for business
24 | and that the vehicle had been driven 15,000 miles during that year.

25 | 92.  In truth and fact, as TROY X. KELLEY well knew, many of the expenses
26 | that TROY X. KELLEY declared as business deductions on Blackstone's Form 1120S
27 | were personal or campaign-related expenses, and at least approximately $57,273 were not

28 |

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1 | expenses associated with any business that Blackstone had engaged in during the tax year
2 | 2012.

3 |       93.    On April 19, 2013, at Olympia, IRS Criminal Investigation ("IRS-
4 | CI") Special Agents interviewed TROY X. KELLEY.  During the interview, TROY X.
5 | KELLEY was asked to explain his tax treatment of the reconveyance fees that TROY X.
6 | KELLEY had consolidated in 2008, but did not declare as income on his 2006 to 2008
7 | income tax returns.  TROY X. KELLEY stated that his company was earning the
8 | $245,000 he was transferring to Blackstone each year by continuing to perform work on
9 | old reconveyance files.

10 |       94.    The statements and representations were false because, as TROY X.
11 | KELLEY then and there knew, TROY X. KELLEY and Blackstone were not tracking
12 | reconveyance transactions.  Post Closing Department had terminated the employees who
13 | previously had performed the work.  In addition, TROY X. KELLEY previously had
14 | testified under oath that Post Closing Department's files had been destroyed in a fire at
15 | Stewart Title's office on June 25, 2008, and in the subsequent crash of TROY X.
16 | KELLEY's computer.

17 |       95.    On or about February 27, 2014, TROY X. KELLEY filed a Form 1120S on
18 | behalf of Blackstone for the tax year 2013, in which he declared gross profits of
19 | $245,000, the same amount that TROY X. KELLEY had declared on the forms for the
20 | previous two years.  Although the form declared $72,446 of business expenses, the
21 | principal such expense was legal fees, which totaled $57,945.  Unlike the forms for the
22 | previous two years, the form did not declare any depreciation for vehicles.  In addition, it
23 | declared substantially-lower amounts of expenses for items such as business travel, and
24 | subscriptions and books.

25 | **VII.    TROY X. KELLEY Continues to Conceal and Disguise his Illicit Proceeds**

26 |       96.    In 2006, TROY X. KELLEY was elected to the Washington House of
27 | Representatives.  TROY X. KELLEY served three two-year terms in that body.  In 2012,
28 |

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  TROY X. KELLEY campaigned for, and was elected, Washington State Auditor, a

2  position that he currently holds.

3      97.    In 2011, after he had funneled the proceeds of his fraudulent business, Post

4  Closing Department, through multiple companies and accounts, and after settlement of

5  the litigation brought by Old Republic, TROY X. KELLEY sought to begin spending for

6  his own benefit the remainder of the proceeds in a manner that would conceal and

7  disguise the nature, location, source, ownership, and control of the funds.

8      98.    As an elected public official, and as a candidate for office, TROY X.

9  KELLEY knew that the source of his income and wealth likely would be subject to

10  additional scrutiny. TROY X. KELLEY was required to file, at regular intervals,

11  financial disclosure forms with the Washington State Public Disclosure Commission,

12  including a Form F-1, Personal Financial Affairs Statement, or a short-form version of

13  that form (collectively, "F-1 Reports"). F-1 Reports detail a candidate/official's sources

14  of income, investments, and ownership interest in companies. F-1 Reports are signed and

15  submitted by the candidate/official under penalty of perjury, and are publicly-available

16  through the Washington State Public Disclosure Commission. Starting with his first F-1

17  Report, filed in 2005, TROY X. KELLEY described Blackstone as a legitimate "holding

18  company" or "company holding investments."

19      99.    TROY X. KELLEY sought to conceal from the victims of his fraud, the

20  government, including the IRS, and the general public, facts relating to his misconduct at

21  Post Closing Department, and, specifically, the fact that a substantial portion of his

22  income and assets derived from his fraudulent conduct. For example, after settling Old

23  Republic's lawsuit against him, TROY X. KELLEY sought unsuccessfully to seal court

24  records in the case.

25      100.   Rather than pay himself directly the remaining fraud proceeds, beginning in

26  2011, TROY X. KELLEY withdrew $245,000 annually from the remaining fraud

27  proceeds that he held first in the Vanguard account in the name of Berkeley United, and

28

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 29

1 | then in the Vanguard account in the name of Blackstone, and funneled the withdrawn

2 | funds through another account held in the name of Blackstone.

3 |     101.    By making annual payments through Blackstone, which TROY X.

4 | KELLEY portrayed as a legitimate company, TROY X. KELLEY concealed and

5 | disguised and attempted to conceal and disguise the nature, location, source, ownership,

6 | and control of the fraud proceeds by making his withdrawals appear as if they were

7 | legitimately-earned income of a business that had been operating for many years, rather

8 | than derived from his illicit activities at Post Closing Department.

9 |     102.    In each of 2013, 2014, and 2015, TROY X. KELLEY withdrew an

10 | additional $245,000 from the Blackstone account at Vanguard. As a result, by February

11 | 27, 2015, the balance on the account had been reduced to $1,355,843.

12 |     103.    On March 26, 2015, notwithstanding the fact that he had told IRS-CI agents

13 | that he still was performing work to earn this money, TROY X. KELLEY wrote two

14 | checks on the account -- which he previously had described as an impound account that

15 | held moneys that he had not earned -- that reduced the balance in the account to zero.

16 | First, TROY X. KELLEY wrote a check to the United States Treasury for $447,421. On

17 | the memo line of that check, TROY X. KELLEY wrote "Form 1040 2016-2020."

18 | Second, TROY X. KELLEY wrote a check in the amount of $908,397 to a trust account

19 | in Seattle in which the funds were to be held for his benefit.

20 |

21 | **COUNT 1**<br>**(Possession and Concealment of Stolen Property)**

22 |

23 |     104.    The allegations set forth in Paragraphs 1 through 103 of this Superseding

24 | Indictment are re-alleged and incorporated as if fully set forth herein.

25 |     105.    From in or about June 2008, to in or about January 2012, at Tacoma, in the

26 | Western District of Washington, and elsewhere, TROY X. KELLEY did possess and

27 | conceal stolen property, knowing the same to have been stolen, unlawfully converted,

28 | and taken, namely, money of a value of $5,000 or more, which money had crossed a State

boundary after being stolen, unlawfully converted, and taken, to wit, funds that were

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 30

taken by fraud from Fidelity National Title and borrowers between January 2006 and March 2008, taken by fraud from Old Republic Title and borrowers between June 2006 and June 2008, and stolen by TROY X. KELLEY between January 2006 and June 2008, and that subsequently were transferred to an account in the name of Blackstone International, Inc., at Nevada State Bank, in the State of Nevada, and further transferred to an account in the name of Berkeley United, LLC, at Vanguard, in the State of Pennsylvania.

All in violation of Title 18, United States Code, Section 2315.

### COUNT 2
**(False Declaration)**

106.    The allegations set forth in Paragraphs 1 through 12, 14 through 94, and 102 through 103 of this Superseding Indictment are re-alleged and incorporated as if fully set forth herein.

107.    On or about August 2, 2010, at Seattle, in the Western District of Washington, TROY X. KELLEY, while under oath and testifying in a civil deposition, knowingly did make a false material declaration in a proceeding before and ancillary to a court of the United States.

108.    On December 10, 2009, Old Republic Title filed a civil lawsuit in King County Superior Court, which was removed to the United States District Court for the Western District of Washington, *Old Republic Title, Ltd v. Troy Kelley, et al.*, C10-0038JLR, on January 6, 2010.  The lawsuit included allegations that, pursuant to TROY X. KELLEY's agreement with Old Republic Title, TROY X. KELLEY and Post Closing Department were obligated to return unused reconveyance-processing fees to borrowers, but did not do so.  Among other things, the lawsuit alleged that this failure constituted a breach of contract and unjust enrichment.   Accordingly, at the time and place of aforesaid deposition, it was material whether, during a previous class action lawsuit in relation to an agreement similar to the one TROY X. KELLEY entered into with Old Republic Title, TROY X. KELLEY, after the class action lawsuit was filed,

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 31

1  acknowledged that he was obligated to pay refunds to borrowers by sending the lead
2  plaintiff, F.C., a $250 refund under cover of a letter acknowledging Post Closing
3  Department's obligation to pay the refund.

4       109.   At the time and place alleged, TROY X. KELLEY appearing as a witness
5  under oath during a deposition, knowingly made the following declarations in response to
6  questions with respect to the material matter alleged, as follows:

7
8        Question:     But you're denying that you sent this letter?

9        Answer:       Yes.

10       Question:     Or denying a recollection of it?

11
12       Answer:       Yes.

13       Question:     Which –

14       Answer:       I don't remember this at all.

15       Question:     You think it's likely that you sent it?

16
17       Answer:       No.

18       Question:     Think it's most likely that you did not?

19       Answer:       Yes.

20
21       110.   The answer given by TROY X. KELLEY to the next-to-last question, as he
22  then and there well knew and believed, was false in that, as he was well aware, TROY X.
23  KELLEY personally wrote the letter and caused the letter to be written, purchased the
24  check made payable to F.C. for $250, and sent the letter to F.C.

       All in violation of Title 18, United States Code, Section 1623(a).
25

26

27

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1

## COUNT 3
### (False Declaration)

2

3    111.   The allegations set forth in Paragraphs 1 through 103 of this Superseding

4    Indictment are re-alleged and incorporated as if fully set forth herein.

5    112.   On or about April 8, 2011, at Olympia and Seattle, in the Western District

6    of Washington, TROY X. KELLEY, in a declaration under penalty of perjury as

7    permitted under Title 28, United States Code, Section 1746, knowingly did make a false

8    material declaration in a proceeding before and ancillary to a court of the United States.

9    113.   On December 10, 2009, Old Republic Title filed a civil lawsuit in King

10   County Superior Court, which was removed to the United States District Court for the

11   Western District of Washington, *Old Republic Title, Ltd v. Troy Kelley, et al.*, C10-

12   0038JLR, on January 6, 2010.  The lawsuit included allegations that, pursuant to TROY

13   X. KELLEY's agreement with Old Republic Title, TROY X. KELLEY and Post Closing

14   Department were obligated to return unused reconveyance-processing fees to borrowers,

15   but did not do so.  Among other things, the lawsuit alleged that this failure constituted a

16   breach of contract and unjust enrichment.   Accordingly, it was material whether during a

17   previous class action lawsuit, in relation to an agreement similar to the one TROY X.

18   KELLEY entered into with Old Republic Title, TROY X. KELLEY, after the class action

19   lawsuit was filed, acknowledged that he was obligated to pay refunds to borrowers by

20   sending the lead plaintiff, F.C., a $250 refund under cover of a letter acknowledging Post

21   Closing Department's obligation to pay the refund.

22   114.   At the time and place alleged, TROY X. KELLEY signed and filed with the

23   court a declaration in which he knowingly made the following statement with respect to

24   the material matter alleged:

25       Old Republic has also submitted a copy of a letter from the
         *Cornelius* litigation in which someone tried to return money
26       to the plaintiff in that case.  As I testified at my deposition, I
27       didn't send this letter, and I don't know who did.

28

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 33

115.   The aforesaid statement of TROY X. KELLEY, as he then and there well knew and believed, was false in that, as he was well aware, TROY X. KELLEY personally wrote the letter and caused the letter to be written, purchased the check made payable to F.C. for $250, sent the letter to F.C., and knew who sent the letter to F.C.

All in violation of Title 18, United States Code, Section 1623(a).

## COUNT 4
### (False Declaration)

116.   The allegations set forth in Paragraphs 1 through 12, 14 through 94, and 102 through 103 of this Superseding Indictment are re-alleged and incorporated as if fully set forth herein.

117.   On or about August 2, 2010, at Seattle, in the Western District of Washington, TROY X. KELLEY, while under oath and testifying in a civil deposition, knowingly did make a false material declaration in a proceeding before and ancillary to a court of the United States.

118.   On December 10, 2009, Old Republic Title filed a civil lawsuit in King County Superior Court, which was removed to the United States District Court for the Western District of Washington, *Old Republic Title, Ltd v. Troy Kelley, et al.*, C10-0038JLR, on January 6, 2010.  The lawsuit included allegations that, pursuant to TROY X. KELLEY's agreement with Old Republic Title, TROY X. KELLEY and Post Closing Department were obligated to return unused reconveyance-processing fees to borrowers, but did not do so.  Among other things, the lawsuit alleged that this failure constituted a breach of contract and unjust enrichment.   Accordingly, at the time and place of aforesaid deposition, it was material whether any verbal amendments had been made which would allow Post Closing Department to charge more for reconveyance tracking than had been provided for in the written agreement.

119.   At the time and place alleged, TROY X. KELLEY appearing as a witness under oath during a deposition knowingly made the following declaration in response to questions with respect to the material matter alleged, as follows:

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 34

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

| | |
|---|---|
| Question: | Who at Old Republic discussed or negotiated with you any of your charges beyond the $20 fee specified in the agreement with Old Republic? |
| Answer: | Carl [Lago]. |

120. The aforesaid testimony of TROY X. KELLEY, as he then and there well knew and believed, was false in that Carl Lago never discussed or negotiated with TROY X. KELLEY the option of earning more than $20 per file.

All in violation of Title 18, United States Code, Section 1623(a).

## COUNT 5
### (False Declaration)

121. The allegations set forth in Paragraphs 1 through 12, 14 through 94, and 102 through 103 of this Superseding Indictment are re-alleged and incorporated as if fully set forth herein.

122. On or about August 2, 2010, at Seattle, in the Western District of Washington, TROY X. KELLEY, while under oath and testifying in a civil deposition, knowingly did make a false material declaration in a proceeding before and ancillary to a court of the United States.

123. On December 10, 2009, Old Republic Title filed a civil lawsuit in King County Superior Court, which was removed to the United States District Court for the Western District of Washington, *Old Republic Title, Ltd v. Troy Kelley, et al.*, C10-0038JLR, on January 6, 2010. The lawsuit included allegations that, pursuant to TROY X. KELLEY's agreement with Old Republic Title, TROY X. KELLEY and Post Closing Department were obligated to return unused reconveyance processing fees to borrowers, but did not do so. Among other things, the lawsuit alleged that this failure constituted a breach of contract and unjust enrichment. It was TROY X. KELLEY's position that he had not returned unused reconveyance fees because the agreement he had entered with Old Republic Title had been verbally modified, providing that Post Closing Department could charge additional fees for every task it performed in relation to each file, and, as a

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 35

1  result, there were no unused reconveyance-processing fees.  Accordingly, at the time and

2  place of aforesaid deposition, it was material whether Post Closing Department

3  employees kept records reflecting all of the tasks they performed on each file.

4       124.    At the time and place alleged, TROY X. KELLEY appearing as a witness

5  under oath during a deposition knowingly made the following declarations in response to

6  questions with respect to the material matter alleged, as follows:

7            Question:    So you had a log or spreadsheet?  What word would you use?

8            Answer:    I would use either word.

9            Question:    And it would have a specific breakdown of each of these fees

10                        and expenses on each transaction?

11            Answer:    Correct.

12            Question:    Would it identify who the – what the specific fee was paid to

13                        PCD?

14            Answer:    Correct.

15            Question:    So for example, you mentioned a fee for contacting lenders.

16            Answer:    Correct.

17            Question:    Would it say what the fee was and that this particular fee was

18                        charged to that escrow file and to contact the lender?

19            Answer:    That's exactly how –

20            Question:    It wouldn't just be "PCD fees $55" without indicating what?

21            Answer:    No, there were separate columns for each different fee.

22       125.    The answer given by TROY X. KELLEY to the last question, as he then

23  and there well knew and believed, was false in that, as he was well aware, TROY X.

24  KELLEY had entered into an agreement with Old Republic Title to track its

25  reconveyances for a flat fee of $20.00 per transaction tracked.  Therefore, Post Closing

26  Department employees were not asked to, and did not, keep track of the individual tasks

27

28

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 36

1   they performed on files.  As a result, Post Closing Department's spreadsheets did not

2   identify specific fees paid to Post Closing Department.

3        All in violation of Title 18, United States Code, Section 1623(a).

### COUNT 6
### (Money Laundering)

126.   The allegations set forth in Paragraphs 1 through 103 of this Superseding
Indictment are re-alleged and incorporated as if fully set forth herein.

127.   On or about June 7, 2011, at Tacoma, in the Western District of
Washington, and elsewhere, TROY X. KELLEY, did knowingly conduct and attempt to
conduct a financial transaction affecting interstate and foreign commerce, to wit, deposit
a check in the amount of $245,000 written on an account at Wells Fargo Bank in the
name of Berkeley United, LLC, into an account at Columbia Bank in the name of
Blackstone International, Inc., which involved the proceeds of a specified unlawful
activity, that is, mail fraud, in violation of Title 18, United States Code, Section 1341,
and wire fraud in violation of Title 18, United States Code, Section 1343, knowing that
the transaction was designed in whole and in part to conceal and disguise the nature,
location, source, ownership, and control of the proceeds of specified unlawful activity,
and while conducting and attempting to conduct such financial transaction knew that the
property involved in the financial transaction represented the proceeds of some form of
unlawful activity.

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

### COUNT 7
### (Money Laundering)

128.   The allegations set forth in Paragraphs 1 through 103 of this Superseding
Indictment are re-alleged and incorporated as if fully set forth herein.

129.   On or about January 6, 2012, at Tacoma, in the Western District of
Washington, and elsewhere, TROY X. KELLEY, did knowingly conduct and attempt to

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  conduct a financial transaction affecting interstate and foreign commerce, to wit, deposit

2  a check in the amount of $245,000 written on an account at Vanguard in the name of

3  Berkeley United, LLC, into an account at Columbia Bank in the name of Blackstone

4  International, Inc., which involved the proceeds of a specified unlawful activity, that is,

5  mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud in

6  violation of Title 18, United States Code, Section 1343, knowing that the transaction was

7  designed in whole and in part to conceal and disguise the nature, location, source,

8  ownership, and control of the proceeds of specified unlawful activity, and while

9  conducting and attempting to conduct such financial transaction knew that the property

10  involved in the financial transaction represented the proceeds of some form of unlawful

11  activity.

12      All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

14  <u>**COUNT 8**</u>
15  **(Money Laundering)**

16      130.    The allegations set forth in Paragraphs 1 through 103 of this Superseding

17  Indictment are re-alleged and incorporated as if fully set forth herein.

18      131.    On or about January 3, 2013, at Tacoma, in the Western District of

19  Washington, and elsewhere, TROY X. KELLEY, did knowingly conduct and attempt to

20  conduct a financial transaction affecting interstate and foreign commerce, to wit, deposit

21  a check in the amount of $245,000 written on an account at Vanguard in the name of

22  Blackstone International, Inc., into an account at Columbia Bank in the name of

23  Blackstone International, Inc., which involved the proceeds of a specified unlawful

24  activity, that is, mail fraud, in violation of Title 18, United States Code, Section 1341,

25  and wire fraud in violation of Title 18, United States Code, Section 1343, knowing that

26  the transaction was designed in whole and in part to conceal and disguise the nature,

27  location, source, ownership, and control of the proceeds of specified unlawful activity,

28  and while conducting and attempting to conduct such financial transaction knew that the

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 38

1  property involved in the financial transaction represented the proceeds of some form of

2  unlawful activity.

3      All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

4

5                              **COUNT 9**
6                          **(Money Laundering)**

7      132.    The allegations set forth in Paragraphs 1 through 103 of this Superseding

8  Indictment are re-alleged and incorporated as if fully set forth herein.

9      133.    On or about January 24, 2014, at Tacoma, in the Western District of

10 Washington, and elsewhere, TROY X. KELLEY, did knowingly conduct and attempt to

11 conduct a financial transaction affecting interstate and foreign commerce, to wit, deposit

12 a check in the amount of $245,000 written on an account at Vanguard in the name of

13 Blackstone International, Inc., into an account at Columbia Bank in the name of

14 Blackstone International, Inc., which involved the proceeds of a specified unlawful

15 activity, that is, mail fraud, in violation of Title 18, United States Code, Section 1341,

16 and wire fraud in violation of Title 18, United States Code, Section 1343, knowing that

17 the transaction was designed in whole and in part to conceal and disguise the nature,

18 location, source, ownership, and control of the proceeds of specified unlawful activity,

19 and while conducting and attempting to conduct such financial transaction knew that the

20 property involved in the financial transaction represented the proceeds of some form of

21 unlawful activity.

22     All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

23

24                             **COUNT 10**
25                         **(Money Laundering)**

26     134.    The allegations set forth in Paragraphs 1 through 103 of this Superseding

27 Indictment are re-alleged and incorporated as if fully set forth herein.

28

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 39

135.    On or about February 2, 2015, at Tacoma, in the Western District of Washington, and elsewhere, TROY X. KELLEY, did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, to wit, deposit by means of wire transfer $245,000 from an account at Vanguard in the name of Blackstone International, Inc., into an account at Columbia Bank in the name of Blackstone International, Inc., which involved the proceeds of a specified unlawful activity, that is, mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud in violation of Title 18, United States Code, Section 1343, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## COUNT 11
### (Corrupt Interference with Internal Revenue Laws)

136.    The allegations set forth in Paragraphs 1 through 103 of this Superseding Indictment are re-alleged and incorporated as if fully set forth herein.

137.    Beginning in or before 2007 and continuing until the present, at Tacoma and elsewhere, in the Western District of Washington, TROY X. KELLEY did corruptly endeavor to obstruct and impede the due administration of the internal revenue laws by failing to declare income that he had obtained by fraud and stolen in the years in which he obtained such income, by falsely declaring a portion of that income in later years in an attempt to make the income legitimate, by claiming fraudulent deductions to reduce his tax obligation on the portion of the income that he did declare, and by making false statements to Internal Revenue Service employees who interviewed him concerning the income.

138.    The Internal Revenue Service ("IRS") is an agency of the United States

1    within the Department of Treasury of the United States responsible for enforcing and

2    administering the tax laws of the United States. The federal income tax system of the

3    United States relies upon citizens to truthfully, accurately, and timely report income and

4    expense information to the IRS.

5        139.    Between 2006 and 2008, having fraudulently obtained and stolen funds

6    from Fidelity National Title, Old Republic Title, and borrowers, TROY X. KELLEY

7    fully realized that the title companies and borrowers might seek the return of their funds.

8    Accordingly, TROY X. KELLEY sought to avoid payment of taxes on the fraudulently-

9    obtained and stolen funds, at least until after any such action was resolved.

10       140.    To do so, between 2006, and 2008, TROY X. KELLEY deliberately

11   underreported on tax returns for the tax years 2006 through 2008, the income that United

12   National earned and that flowed through to Blackstone and ATS, and then to TROY X.

13   KELLEY's and D.D.K.'s tax returns. In total, TROY X. KELLEY failed to report a total

14   of more than $3,000,000 of income on United's tax returns for 2006 through 2008. As a

15   result, TROY X. KELLEY failed to report on his and D.D.K.'s joint tax returns, and to

16   pay, a total of approximately $1,000,000 of taxes for those three years.

17       141.    After failing to report Post Closing Department's true income on United

18   National's tax returns for the years 2006 through 2008, TROY X. KELLEY kept that

19   untaxed money in an account in the name of Berkeley United at Vanguard from 2008

20   through 2011. On May 3, 2011, TROY X. KELLEY settled the last remaining piece of

21   litigation against him relating to the stolen reconveyance funds. Following that

22   settlement, TROY X. KELLEY paid Old Republic $1,050,000 drawn from the Berkeley

23   United account at Vanguard, so that Old Republic could refund the money to borrowers.

24       142.    Beginning a month later, on June 3, 2011, TROY X. KELLEY transferred

25   $245,000 per year of this money to accounts that he controlled. TROY X. KELLEY

26   reported this amount as income on Blackstone tax returns for the years 2011 through at

27   least 2013. TROY X. KELLEY offset the income by claiming fraudulent deductions for

28   expenses that either were wholly fraudulent or that were for personal expenses, rather

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 41

than legitimate business expenses of Blackstone.  TROY X. KELLEY claimed these

fraudulent expenses both to reduce his tax obligation, and in an attempt to provide an

appearance of legitimacy for Blackstone, which otherwise would have had substantial

income but no reported expenses.

143.    TROY X. KELLEY claimed $66,147 in fraudulent business deductions on

Blackstone's 2011 Form 1120S, and claimed $60,425 in business deductions, at least

$57,273 of which were fraudulent, on Blackstone's 2012 Form 1120S.  Because

Blackstone's ordinary business income was reportable on TROY X. KELLEY's and

D.D.K.'s joint personal tax return, TROY X. KELLEY thereby reduced his own taxable

income for each of 2011 and 2012.  The overall effect of the claimed expenses was to

reduce TROY X. KELLEY's personal tax obligation by approximately $20,000 in each

of 2011 and 2012.

144.    When TROY X. KELLEY was interviewed by Internal Revenue Service –

Criminal Investigation Special Agents, on April 19, 2013, TROY X. KELLEY made

false and fraudulent statements concerning his actions.  In particular, TROY X. KELLEY

falsely claimed that Blackstone was continuing to work on reconveyance files, and,

thereby, had earned the $245,000 in income that it reported in each of 2011 and 2012.

All in violation of Title 26, United States Code, Section 7212(a).

## COUNT 12
### (Filing False Income Tax Return)

145.    The allegations set forth in Paragraphs 1 through 12, 14 through 94, and

102 through 103 of this Superseding Indictment are re-alleged and incorporated as if fully

set forth herein.

146.    On or about October 9, 2008, at Seattle, in the Western District of

Washington, TROY X. KELLEY, a resident of Tacoma, Washington, did willfully make

and subscribe a US Return of Partnership Income, Form 1065, for United National, LLC

for calendar year 2008, which was verified by a written declaration that it was made

under the penalties of perjury and which he did not believe to be true and correct as to

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

every material matter.  That income tax return, which was filed with the Internal Revenue Service, reported "gross receipts or sales" of $198,996, whereas, as TROY X. KELLEY then and there well knew, United National LLC received additional gross receipts not stated on the return, to wit, at least approximately $304,019 of additional gross receipts.

All in violation of Title 26, United States Code, Section 7206(1).

## COUNT 13
### (Filing False Income Tax Return)

147.    The allegations set forth in Paragraphs 1 through 12, 14 through 94, and 102 through 103 of this Superseding Indictment are re-alleged and incorporated as if fully set forth herein.

148.    On or about March 31, 2009, at Tacoma, in the Western District of Washington, TROY X. KELLEY, a resident of Tacoma, Washington, did willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for himself and his wife D.D.K. for calendar year 2008, which was verified by a written declaration that it was made under the penalties of perjury and which he did not believe to be true and correct as to every material matter.  That income tax return, which was filed with the Internal Revenue Service, reported income from Blackstone International, Inc., and Attorney Trustee Services, Inc., of $169,868 and total income of $322,659, whereas, as TROY X. KELLEY then and there well knew, he and D.D.K. had income from Blackstone International, Inc., and Attorney Trustee Services, Inc., in addition to the amount stated on the return, to wit, additional income of at least approximately $292,954.

All in violation of Title 26, United States Code, Section 7206(1).

## COUNT 14
### (Filing False Income Tax Return)

149.    The allegations set forth in Paragraphs 1 through 103 of this Superseding Indictment are re-alleged and incorporated as if fully set forth herein.

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 43

150.    On or about February 28, 2012, at Tacoma, in the Western District of Washington, TROY X. KELLEY, a resident of Tacoma, Washington, did willfully make and subscribe a U.S. Income Tax Return for an S Corporation, Form 1120S, for Blackstone International, Inc., for calendar year 2011, which was verified by a written declaration that it was made under the penalties of perjury and which he did not believe to be true and correct as to every material matter.  That income tax return, which was filed with the Internal Revenue Service, reported gross profits of $245,000 and reported business expenses of $66,147 as deductions, whereas, as TROY X. KELLEY then and there well knew, Blackstone International did not have the gross profits declared and had not incurred all of the expenses pursuant to any business it had conducted during 2011.

All in violation of Title 26, United States Code, Section 7206(1).

## COUNT 15
### (Filing False Income Tax Return)

151.    The allegations set forth in Paragraphs 1 through 103 of this Superseding Indictment are re-alleged and incorporated as if fully set forth herein.

152.    On or about February 2, 2013, at Tacoma, in the Western District of Washington, TROY X. KELLEY, a resident of Tacoma, Washington, did willfully make and subscribe a U.S. Income Tax Return for an S Corporation, Form 1120S, for Blackstone International, Inc., for calendar year 2012, which was verified by a written declaration that it was made under the penalties of perjury and which he did not believe to be true and correct as to every material matter.  That income tax return, which was filed with the Internal Revenue Service, reported gross receipts of $245,000 and reported business expenses of $60,425, as deductions, whereas, as TROY X. KELLEY then and there well knew, Blackstone International, Inc., did not have the gross receipts declared and had not incurred $57,273 of the expenses pursuant to any business it had conducted during 2012.

All in violation of Title 26, United States Code, Section 7206(1).

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

## COUNT 16
### (False Statements)

153.     The allegations set forth in Paragraphs 1 through 103 of this Superseding Indictment are re-alleged and incorporated as if fully set forth herein.

154.     On or about April 19, 2013, at Olympia, within the Western District of Washington, TROY X. KELLEY did willfully and knowingly make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, by informing Internal Revenue Service – Criminal Investigation Special Agents during an interview that, Blackstone International earned the $245,000 he transferred to Blackstone International, Inc., in each of 2011 and 2012, by continuing to perform work on reconveyance files. The statements and representations were false because, as TROY X. KELLEY then and there knew, TROY X. KELLEY and Blackstone International, Inc., were not performing any significant work tracking reconveyance transactions in 2011 and 2012.

All in violation of Title 18, United States Code, Section 1001.

## COUNT 17
### (Filing False Income Tax Return)

155.     The allegations set forth in Paragraphs 1 through 103 of this Superseding Indictment are re-alleged and incorporated as if fully set forth herein.

156.     On or about February 27, 2014, at Tacoma, in the Western District of Washington, TROY X. KELLEY, a resident of Tacoma, Washington, did willfully make and subscribe a U.S. Income Tax Return for an S Corporation, Form 1120S, for Blackstone International, Inc., for calendar year 2013, which was verified by a written declaration that it was made under the penalties of perjury and which he did not believe to be true and correct as to every material matter.  That income tax return, which was filed with the Internal Revenue Service, reported gross receipts of $245,000, whereas, as

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1 | TROY X. KELLEY then and there well knew, Blackstone International, Inc., did not

2 | have the gross receipts declared during 2013.

3 |       All in violation of Title 26, United States Code, Section 7206(1).

4 |

5 | **FORFEITURE ALLEGATION**

6 |     157.  The allegations contained in Count 1 of this Superseding Indictment are

7 | hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture

8 | pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States

9 | Code, Section 2461(c).

10 |     158.  Upon conviction of the offense of Possession and Concealment of Stolen

11 | Property in violation of Title 18, United States Code, Section 2315, set forth in Count 1

12 | above, TROY X. KELLEY shall forfeit to the United States, pursuant to Title 18, United

13 | States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all

14 | property, real or personal, that constitutes or is derived from proceeds traceable to such

15 | offense, including but not limited to the following property:

16 |         a.    Money Judgment.  A sum of money equal to approximately

17 |              $1,463,171, representing the amount of proceeds obtained as a result

18 |              of the offense set forth in Count 1, above.

19 |     159.  The allegations contained in Counts 6 through 10 of this Superseding

20 | Indictment are hereby re-alleged and incorporated by reference for the purpose of

21 | alleging forfeitures pursuant to Title 18, United States Code, Sections 982(a)(1).  Upon

22 | conviction of an offense in violation of Title 18, United States Code, Section 1956, the

23 | defendant, TROY X. KELLEY, shall forfeit to the United States of America any

24 | property, real or personal, involved in such offense, and any property traceable to such

25 | property pursuant to Title 18, United States Code, Section 982(a)(1).  The property to be

26 | forfeited includes, but is not limited to, the following:

27 |         a.    The sum of $908,397.51 in United States funds, contained in Bank

28 |              of America account No. XXXXXXXX3414, that was transferred

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1                 from Vanguard Prime Money Market Fund Account XXXX6680,

2                 held in the name of Blackstone International, Inc., on March 26,

3                 2015.

4        b.     The sum of $447,421.00 in United States funds that was transferred

5                 from Vanguard Prime Money Market Fund Account XXXX6680,

6                 held in the name of Blackstone International, Inc., on March 26,
                   2015.

7

8     160.   If any of the property described above, as a result of any act or omission of

the defendant:

9        a.     cannot be located upon the exercise of due diligence;

10

11       b.     has been transferred or sold to, or deposited with, a third party;

12       c.     has been placed beyond the jurisdiction of the court;

13       d.     has been substantially diminished in value; or

14       e.     has been commingled with other property which cannot be divided

15                without difficulty,

16  //

17  //

18  //

19

20

21

22

23

24

25

26

27

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  the United States of America shall be entitled to forfeiture of substitute property pursuant

2  to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States

3  Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

A TRUE BILL:

DATED: 9/03/2015

Signature of Foreperson redacted pursuant
to the policy of the Judicial Conference of the
United States

_____
FOREPERSON

ANNETTE L. HAYES
United States Attorney

ANDREW C. FRIEDMAN
Assistant United States Attorney

KATHERYN K. FRIERSON
Assistant United States Attorney

ARLEN R. STORM
Assistant United States Attorney

SUPERSEDING INDICTMENT/KELLEY (No. CR15-5198RBL) - 48